In re MARRIAGE OF JOHANNA L. GUNN, Petitioner-Appellee, and JOHN B. GUNN, Respondent-Appellant.

Fifth District   No. 5—91—0056

Opinion filed August 27, 1992.

John B. Gunn, of Walker & Williams, P.C., of Belleville, appellant *pro se.*

Harry J. Sterling, of Harry J. Sterling, P.C., of Fairview Heights, for appellee.

JUSTICE SHONKWILER delivered the opinion of the court:

A judgment of dissolution of marriage was entered by the circuit court in St. Clair County on April 7, 1988, dissolving the marriage of the petitioner, Johanna L. Gunn, and the respondent, John B. Gunn.

The trial court awarded joint custody of the minor children to the parties, with Johanna designated as primary physical custodian; ordered John to pay child support, maintenance, post-secondary education for the children, attorney fees, and marital debts; and placed a fair market value on, and divided, the marital property.

Both parties filed post-trial motions which were denied by the trial court.

John alleges in his appeal that the trial court erred by:

(1) awarding permanent maintenance to Johanna in the sum of $4,000 per month;

(2) failing to impose upon Johanna an affirmative obligation to encourage financial independence;

(3) valuing John's 20 shares of stock in the law firm of Walker & Williams, a professional corporation, in the sum of $100,000; and

(4) creating an ambiguity in the judgment order relating to deferred compensation.

## FACTS

John and Johanna were married on September 4, 1965. At the time of the dissolution (April 7, 1988), John was 55 years of age and Johanna approximately 44. The parties had four children, Jodi, born June 9, 1967; Sheri, June 13, 1969; Jeff, October 21, 1970; and Lori, May 29, 1974.

Johanna attended high school and upon graduation worked as a bookkeeper at a bank for two years, then as a receptionist at a law firm until married. After her marriage she was a full-time wife, mother and homemaker. In July 1986, she started part time as a sales clerk at Famous-Barr. She worked 14 hours a week at $4 per hour, plus 2% commission, and averaged around $100 net per week. In 1987, Johanna enrolled at the Forest Park Community College studying phlebotomy.

John received his license to practice law prior to his marriage to Johanna. On July 1, 1973, he began working for the Belleville defense firm of Walker & Williams and was made a partner within a year or

so. In addition to John's trial practice, he is also actively involved with administrative matters of the firm. Between 1980 and 1985, John billed out a low of 2,831 to a high of 3,400 hours per year. The trial court found in its judgment "[t]hat the economic contributions of the defendant are significant and substantial and the work habits of the defendant are extraordinary."

Neither is in perfect health. John has high blood pressure, had a left hip prosthesis, may need one on the right hip, and may require a knee replacement.

Johanna had surgery on her arms with the residual effect of numbness in the fingers of her hands, has inflammation of the nerves in her right eye, ulcers, and gall bladder difficulties, and underwent a hysterectomy. John testified that he thought Johanna would have difficulty in obtaining health insurance due to her preexisting medical problems unless she was able to obtain insurance through a group plan.

Johanna knew little or nothing about the family finances. John paid most of the bills and invested without consulting her.

## MAINTENANCE

John does not object to Johanna's award of maintenance but argues that the award of permanent maintenance in the sum of $4,000 per month is excessive in duration and amount, that it exceeds her reasonable needs, and that it fails to take into consideration her freedom from debt.

On February 10, 1987, in a hearing on temporary matters, the court awarded temporary maintenance to Johanna in the monthly sum of $1,300. However, in the final judgment, the court increased maintenance to $4,000 per month until John retired or Johanna reached the age of 60, whichever came first. The judgment provided that "[s]hould the defendant retire from the full-practice of law and not draw any benefits from his deferred compensation program for a period of 60 days, the Court shall entertain a motion to determine what support, if any, shall be paid by the defendant to the plaintiff." (Emphasis in original.) The judgment also provided, by formula, the amount Johanna was to receive from John's deferred compensation program "if and when received" by him.

Prior to an award of maintenance, if any, the trial court must first determine the disposition of marital property since both are inextricably related. After the property has been distributed in "just proportions," the court then reviews the award of maintenance on the rec-

ord as a whole. *In re Marriage of Amato* (1980), 80 Ill. App. 3d 395, 399 N.E.2d 1018; see also Ill. Rev. Stat. 1987, ch. 40, par. 504(a)(1).

Section 503(d) of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1987, ch. 40, par. 101 *et seq.*) provides that the trial court should divide marital property:

"in just proportions considering all relevant factors, including:

(1) the contribution or dissipation of each party in the acquisition, preservation, or depreciation or appreciation in value, of the marital and non-marital property, including the contribution of a spouse as a homemaker or to the family unit;

(2) the value of the property set apart to each spouse;

(3) the duration of the marriage;

(4) the relevant economic circumstances of each spouse when the division of property is to become effective, including the desirability of awarding the family home, or the right to live therein for reasonable periods, to the spouse having custody of the children;

* * *

(7) the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and needs of each of the parties;

(8) the custodial provisions for any children;

(9) whether the apportionment is in lieu of or in addition to maintenance;

(10) the reasonable opportunity of each spouse for future acquisition of capital assets and income; and

(11) the tax consequences of the property division upon the respective economic circumstances of the parties." Ill. Rev. Stat. 1987, ch. 40, par. 503(d).

In its judgment, the trial court awarded John two duplexes which he purchased "strictly as a tax situation," with the trial court setting negative values of $16,000 on one and $356 on the other. It awarded Johanna's IRA to her ($2,500) and John's IRA to him ($15,826); the marital home at No. 69 Country Club Acres to Johanna ($121,164); household furnishings to Johanna ($9,000) and to John ($2,500); two cars to Johanna (total value $10,000) and two cars to John (total value $18,000); from John's portion of the Walker & Williams profit-sharing plan, part to Johanna ($75,000) and the balance to John ($201,838); and 20 shares of Walker & Williams stock to John ($100,000). The court valued as "speculative" the Walker & Williams deferred compensation plan.

In the total division of marital property, John was awarded $335,335 (including a deduction of $16,356 for the negative value of the duplexes), and Johanna was awarded $231,928, a difference favoring John of $103,407. John was, however, directed to pay all of the marital debts in the sum of $87,775.40, which included money he had borrowed from the profit-sharing plan of Walker & Williams ($50,000). A house owned by the parties in Mesa, Arizona, was ordered sold. It was given no value by the court, and part of the debt assigned to John ($12,736.40) was a Federal income tax recapture on the house.

■ It was appropriate that Johanna was awarded the marital home, together with most of its furnishings, since she had the physical custody of the children. However, along with any house come the inevitable expenses of maintenance, repair, tax, utilities, and insurance. John was properly awarded the two duplexes he purchased as a tax shelter. Johanna was awarded 27.1% ($75,000) of John's $276,838 profit-sharing plan, leaving the bulk to John.

Little, if any, of the parties' marital property has income-producing capabilities. In some dissolutions, there is sufficient income-producing property to provide for the reasonable needs of each party—in the case before us, there is not. John's potential for producing income as a partner in a good law firm is the major asset of the marriage and must be considered by the court when dividing the marital property. The court, in balancing the respective interests of the parties, must fairly divide the assets to provide for the reasonable needs of each within the bounds of the property to be distributed and the ability of both to produce income.

It is obvious Johanna has no means of paying marital debts, and the trial court correctly assigned these to John. The home in Mesa, Arizona, was properly ordered sold with the proceeds to apply to the debt. A review of the trial court's judgment and the record shows a careful consideration by the trial court in the distribution of the marital assets and debts. John concedes that he has a greater ability to acquire future assets than Johanna, and the record more than bears that out. We find that the trial court followed the statutory guidelines in distributing the marital property and that such distribution was equitable and not against the manifest weight of the evidence.

After the trial court has distributed marital property, before an award of maintenance can be granted, the court must find that two factors exist—that the spouse seeking maintenance:

"(1) lacks sufficient property, including marital property apportioned to him, to provide for his reasonable needs, *and*

(2) is unable to support himself through appropriate employment or is the custodian of a child whose condition or circumstances make it appropriate that the custodian not be required to seek employment outside the home, *or*

(3) is otherwise without sufficient income." (Emphasis added.) Ill. Rev. Stat. 1987, ch. 40, par. 504(a).

We have reviewed the record and agree with the trial court that Johanna lacks sufficient property, including marital property apportioned to her, to provide for her reasonable needs and is unable to support herself through appropriate employment. We also believe that she meets the second factor in that she is otherwise without sufficient income.

If the trial court finds that an award of maintenance is justified, it then turns to the question of amount and duration, and the Illinois Marriage and Dissolution of Marriage Act (Dissolution Act) provides certain guidelines for determining that issue. Section 504(b) of the Dissolution Act states:

"(b) The maintenance order shall be in such amounts and for such periods of time as the court deems just, made without regard to marital misconduct and may be in gross or for fixed or indefinite periods of time and the maintenance may be made from the income or property of the other spouse after consideration of all relevant factors, including:

(1) the financial resources of the party seeking maintenance, including marital property apportioned to him, and his ability to meet his needs independently, including the extent to which a provision for support of a child living with the party includes a sum for that party as custodian;

(2) the time necessary to acquire sufficient education or training to enable the party seeking maintenance to find appropriate employment;

(3) the standard of living established during the marriage;

(4) the duration of the marriage;

(5) the age and the physical and emotional condition of both parties;

(6) the ability of the spouse from whom maintenance is sought to meet his needs while meeting those of the spouse seeking maintenance; and

(7) the tax consequences of the property division upon the respective economic circumstances of the parties." Ill. Rev. Stat. 1987, ch. 40, par. 504(b).

■■ John argues that Johanna has been awarded permanent maintenance. We do not agree. Section 510(a) of the Dissolution Act provides that maintenance may be modified "only upon a showing of a substantial change in circumstances." (Ill. Rev. Stat. 1987, ch. 40, par. 510(a).) Section 510(c) provides that maintenance can terminate automatically: "[u]nless otherwise agreed by the parties in a written agreement set forth in the judgment or otherwise approved by the court, the obligation to pay future maintenance is terminated upon the death of either party, or the remarriage of the party receiving maintenance, or if the party receiving maintenance cohabits with another person on a resident, continuing conjugal basis." (Ill. Rev. Stat. 1987, ch. 40, par. 510(c).) Johanna's maintenance is not permanent but has a discernible termination date—when she reaches 60 or John retires, whichever comes first. Permanent maintenance remains in full force and effect until modified by the court or one of the statutory criteria set forth in section 504(b) of the Dissolution Act occurs. (Ill. Rev. Stat. 1987, ch. 40, par. 504(b).) Although maintenance in the case before us is not permanent or indefinite, it is of long duration, and the court assumes that the duration involved is the basis for John's appeal on that issue.

The reviewing court has previously stated that due to a wide variation in the standard of living of parties throughout the State seeking dissolution, it is impossible to have a uniform objective standard or formula to determine the amount and duration of maintenance. (*In re Marriage of Simmons* (1980), 87 Ill. App. 3d 651, 409 N.E.2d 321.) In *Simmons*, the court, citing *Brueggeman v. Brueggeman* (Mo. App. 1977), 551 S.W.2d 853, said:

> "The trial judge must decide what needs are reasonable on a case by case basis, taking into account the circumstances of the involved parties. Standard of living before and during the marriage, duration of the marriage and the social position of the spouse seeking maintenance can all be relevant, as would be special needs such as medical expenses. But the trial judge may take into account many other considerations, including but not limited to the factors listed in section 504(b)." *Simmons*, 87 Ill. App. 3d at 658, 404 N.E.2d at 326.

In the case of *In re Marriage of Albiani* (1987), 159 Ill. App. 3d 519, 512 N.E.2d 30, the reviewing court discussed limited, as opposed to permanent or long-term, maintenance and when each would be appropriate:

> "The purpose of granting the trial court the discretion to authorize rehabilitative or time-limited maintenance is to provide

incentive for the spouse receiving support to use diligence in procuring training or skills necessary to attain self-sufficiency. (*In re Marriage of Wilder* (1983), 122 Ill. App. 3d 338, 351, 461 N.E.2d 447.) This goal, however, must be balanced against a realistic appraisal of the likelihood that the spouse will be able to support himself or herself in some reasonable approximation of the standard of living established during the marriage. (*In re Marriage of Hellwig* (1981), 100 Ill. App. 3d 452, 464-65, 426 N.E.2d 1087.) Accordingly, limited maintenance is appropriate only where the spouse is employable at an income which would provide approximately the standard of living enjoyed during the marriage. (*In re Marriage of Wilder* (1983), 122 Ill. App. 3d 338, 351-52, 461 N.E.2d 447.) Permanent maintenance, on the other hand, is necessary where the spouse is not employable or is employable only at a low income as compared to his or her previous standard of living." *Albiani*, 159 Ill. App. 3d at 523-24, 512 N.E.2d at 33.

See also *In re Marriage of Hellwig* (1981), 100 Ill. App. 3d 452, 426 N.E.2d 1087.

In the case at bar, Johanna's net pay is $100 per week. In John's unverified "Combined Statement of Finances, Income and Expenses" filed with the court in 1978, John listed his average net per month, including distributions, as $10,540.41. In the parties' 1986 Federal income tax return (Form 1040, Schedule W), John's salary income is listed as $192,799.21 and Johanna's $4,408.85. John testified that he thought Johanna could work full time as a sales clerk, receptionist, restaurant hostess or in real estate. Johanna testified that she had not considered working full time and thought, prior to the dissolution, she would never have to work; further, while the children were at home she felt she should not work full time because of the children. The record indicates that Johanna was working part time as a sales clerk, was receiving training in phlebotomy, and the wage of a phlebotomist was $4.44 per hour. Johanna's time during the marriage has been, for the most part, occupied solely as a mother and homemaker. She has lost her marketable skills, while John has perfected his as an attorney during the 23-year marriage.

The commendable goal of the Dissolution Act is mutual independence after dissolution. In some cases this can be achieved through distribution of property; in other cases, it cannot. Unfortunately, the Gunns do not have sufficient property, after distribution, to allow both to live in the lifestyle to which they have become accustomed, and as the Gunns are no doubt painfully aware, it takes more to live apart

than together. The effect of dividing one household into two is especially severe when there has been but one wage earner. In such a case, where there is insufficient income-producing property, maintenance is both a valid and a necessary consideration.

John argues that with Johanna's part-time job and the maintenance he has been ordered to pay, she has a monthly surplus of $884.69 after payment of State and Federal income taxes. According to the parties' affidavits, John's monthly living expense (excluding child support and payment of debts) is $2,130 and Johanna's $2,790.63.

The Dissolution Act directs that maintenance be made in relation to the "ability of the spouse from whom maintenance is sought to meet his needs while meeting those of the spouse seeking maintenance" (Ill. Rev. Stat. 1987, ch. 40, par. 504(b)(6)). This does not necessarily mean minimum needs, since the court is also directed to consider the standard of living established during the marriage. Ill. Rev. Stat. 1987, ch. 40, par. 504(b)(3).

The award of maintenance is a matter within the sound discretion of the trial court and will not be overturned on appeal unless there is an abuse of discretion or the award is against the manifest weight of the evidence. (*Schuppe v. Schuppe* (1979), 69 Ill. App. 3d 200, 203, 387 N.E.2d 346, 348; *In re Marriage of Asch* (1981), 100 Ill. App. 3d 293, 426 N.E.2d 1066.) The reviewing court is not justified in substituting its discretion for that of the trial court absent an abuse of discretion. (*In re Marriage of Lee* (1979), 78 Ill. App. 3d 1123, 1127, 398 N.E.2d 126, 129.) An abuse of discretion occurs only where no reasonable person would take the position adopted by the trial court. *Lee*, 78 Ill. App. 3d at 1127, 398 N.E.2d at 129.

In light of the provision of section 504(b)(2), which directs the court to consider the time necessary for the spouse seeking maintenance to acquire a sufficient education or training to obtain appropriate employment, we believe the burden is on the spouse seeking permanent or long-term maintenance to show the necessity for such maintenance. Considering the length of the marriage, Johanna's financial resources including the property apportioned to her, her inability to meet her needs independently, her loss of job skills, her age, physical and emotional condition, her lack of higher education, her station in life and standard of living established during the marriage, the economic circumstances of the parties, and the ability for the defendant to meet his own needs while meeting those of petitioner, we find that Johanna has met her burden of proof, and that the trial court did not abuse its discretion in the award of long-term mainte-

nance. We also note that any maintenance received will be taxed to Johanna and a tax deduction to John.

AFFIRMATIVE OBLIGATION TO ENCOURAGE FINANCIAL INDEPENDENCE

John also argues on appeal that the trial court, instead of giving "permanent maintenance," should have awarded rehabilitative maintenance and expressed in clear and unequivocal terms the affirmative obligation for Johanna to work toward financial independence; established a periodic review, reporting and monitoring procedure; provided for a reduction in maintenance commensurate with Johanna's increased earnings as they occur; and reduced its award to eliminate the surplus.

This is closely connected to his first issue on appeal—that Johanna should have been awarded short-term, rehabilitative maintenance, rather than long-term. Indeed, John is correct when he states that the trial court must consider as a factor in its award of maintenance "the time necessary to acquire sufficient education or training to enable the party seeking maintenance to find appropriate employment." Ill. Rev. Stat. 1987, ch. 40, par. 504(b)(2).

John cites *In re Marriage of Wilder* (1983), 122 Ill. App. 3d 338, 461 N.E.2d 447, as supporting his view. In that case, the court stated: "The objective of the Act in authorizing rehabilitative maintenance is to enable a formerly dependent spouse to become financially independent in the future. (*In re Marriage of Bramson* (1981), 100 Ill. App. 3d 657, 427 N.E.2d 285.) A limitation on the award is generally intended as 'an incentive for the spouse receiving support to use diligence in procuring training or skills necessary to attain self-sufficiency.' (*In re Marriage of Hellwig* (1981), 100 Ill. App. 3d 452, 464, 426 N.E.2d 1087, 1096.)" (*Wilder*, 122 Ill. App. 3d at 352, 461 N.E.2d at 456.) In that case, however, the reviewing court found that rehabilitative maintenance limited to a five-year term was against the manifest weight of the evidence and that there was insufficient evidence to support such a rigid limitation. The case was reversed, and the trial court was directed to reserve jurisdiction over the maintenance award for a five-year period, then reevaluate the circumstances of the parties.

John also cites *In re Marriage of Teauseau* (1989), 185 Ill. App. 3d 22, 540 N.E.2d 820, where the reviewing court held that the trial court abused its discretion in ordering that maintenance would automatically terminate after a four-year period, and the reviewing court directed a review of the award; *In re Marriage of Lasota* (1984), 125 Ill. App. 3d 37, 465 N.E.2d 649, where the court terminated mainte-

nance due to the husband's loss of job and his receipt of only $268 per month in veteran's disability payments; and *Ingrassia v. Ingrassia* (1987), 156 Ill. App. 3d 483, 509 N.E.2d 729, in which the court terminated maintenance pursuant to a prior marital settlement agreement voluntarily entered into by and between the parties.

John urges us to follow the reasoning of the reviewing court in the case of *In re Marriage of Gentry* (1989), 188 Ill. App. 3d 372, 544 N.E.2d 435. In that case, the wife had a high school education, worked as a clerk during the first two years of marriage but quit upon becoming pregnant, was married for 25 years, had two children, attended a junior college to learn word processing and sought employment in that capacity up until the hearing. Her husband worked for Caterpillar, Inc., and earned a monthly net of $2,752.96. The trial court awarded rehabilitative maintenance in the sum of $900 for the first eight months then reduced the award to $750 per month to be reviewed after four years. The reviewing court affirmed the award but went on to say:

> "However, no real provision was made to monitor Joyce's efforts to find suitable employment, etc. Because of the terms of this dissolution order and its related divisions and distributions, we find it is necessary and appropriate that the trial court retain jurisdiction of the maintenance award. After two years from the entry of the original order, the same shall be reviewed annually, at the request of either party, for the purpose of taking into account Joyce's affirmative obligation and progress in becoming self-sufficient, as well as to permit the judge to review the current income and expenses of the parties. In any event, the maintenance shall not be permanent." *Gentry*, 188 Ill. App. 3d at 377-78, 544 N.E.2d at 438-39.

In a case cited by both John and Johanna, *In re Marriage of Mittra* (1983), 114 Ill. App. 3d 627, 450 N.E.2d 1229, the parties had been married 23 years; had three children; the wife was 46 years old; was a full-time homemaker during the marriage; at the time of the dissolution was employed as a part-time teacher's aide at $226 net per month; and had received a master's degree in history from the University of New Delhi but was unaware of employment prospects and felt incapable of finding employment appropriate to her degree. The husband was 49 years of age; was a professor of electrical engineering; made additional income as a consultant; and received a monthly gross income of $6,287. The husband appealed the amount and duration of maintenance.

The reviewing court affirmed the indefinite award of maintenance at $1,800 per month and stated:

"The trial judge is in a much better position than we are to assess petitioner's education, training and skills, and we cannot conclude that his findings were manifestly erroneous under the circumstances presented in this case. *In re Marriage of Westphal* (1981), 99 Ill. App. 3d 1042, 426 N.E.2d 303.

Despite our affirmance of this indefinite award, we do note that petitioner is under an affirmative obligation to seek appropriate training and skills to become financially independent in the future. This is inherent in the concept of rehabilitative maintenance which is embraced within the Act and is reflected in the comments to section 504(b)(2) ***. ***

The failure of petitioner to make good-faith efforts to achieve this goal, following a reasonable time frame during which the objective should be accomplished, might form the basis for a petition for modification pursuant to section 510(a) of the Act. Ill. Rev. Stat. 1981, ch. 40, par. 510(a); *Tan v. Tan* (1972), 3 Ill. App. 3d 671, 279 N.E.2d 486; *Lindsay v. Lindsay* ([Ct. App.] 1977), 115 Ariz. 322, 565 P.2d 199." *In re Marriage of Mittra* (1983), 114 Ill. App. 3d 627, 634-35, 450 N.E.2d 1229, 1234.

The Historical and Practice Notes under section 504(b)(2) speak of a formerly dependent spouse's obligation to seek financial independence, and they provide in pertinent part:

"This subsection directs the court to consider the time necessary for the party seeking maintenance to acquire sufficient education or training to find employment. This concept of rehabilitative maintenance is new to Illinois law. The amount and duration of such maintenance should be determined by reference to what is necessary to obviate marriage-conditioned needs and to enable a formerly dependent spouse to acquire financial independence for the future. Under prior decisional law, there was no duty to seek employment. Marriott v. Marriott, 347 Ill. App. 372, 106 N.E.2d 876 (1st Dist. 1952). This subsection creates an affirmative obligation on the part of the spouse seeking maintenance to seek employment, where plausible, and this reflects one of the most important changes brought about by this Act. Brueggemann v. Brueggemann, 551 S.W.2d 853, 858 (Mo. App. 1977)." Ill. Ann. Stat., ch. 40, par. 504(b)(2), Historical and Practice Notes, at 529 (Smith-Hurd 1980).

Although there is a mandated duty to acquire financial independence, and rehabilitative maintenance is an incentive to assist a

spouse in achieving that goal, it is the trial judge who is better able to determine if such an incentive is necessary, and that determination will not be overturned absent a clear abuse of discretion. The trial court can also assess whether the spouse receiving maintenance will realistically be able to fully or partially support him or herself through employment with the standard of living established during the marriage. The longer one is married without employment the more difficult it will be to obtain a marketable skill and assimilate back into the work force. During the long-term marriage between John and Johanna, he did not appear to encourage her independence—he paid most of the bills; he seldom, if ever, discussed or even consulted her on business or investment matters, and when she asked him about these concerns, he gave noninformative answers.

■ We believe the view followed by the court in *Mittra* is the better view as it relates to the facts in the case before us—that it is the trial judge who is in a much better position than we to assess petitioner's education, training, and skills (*Mittra*, 114 Ill. App. 3d at 634, 450 N.E.2d at 1234), and especially whether a review of the spouse's attempt to obtain training and skills to encourage her financial independence is necessary. To insist that every award of long-term maintenance be automatically reviewed does not take into account judicial economy or whether, under the unique circumstances of the parties, the facts of the case, and the standard of living achieved during the marriage, the spouse receiving maintenance could ever obtain the training or skills necessary to provide partial or full independence.

We understand our ruling today places a greater burden on John than had we directed a periodic review of maintenance, since now John must file a petition for modification and prove a "substantial change of circumstances" (Ill. Rev. Stat. 1989, ch. 40, par. 510(a)) or that Johanna has failed to make a good-faith effort, within a reasonable time frame, to obtain employment (*In re Mittra*, 114 Ill. App. 3d at 633, 145 N.E.2d at 1234), prior to Johanna's maintenance being reduced or discontinued. However, once John shows a substantial change of circumstances, the burden then shifts to Johanna to prove she is actively acquiring skills and training, is making a good-faith effort to seek appropriate employment, is appropriately employed, or, for good reason, is unable to work toward, or obtain, financial independence. What is "appropriate" employment or whether she is able to acquire partial or full financial independence will depend, in part, on her health, age, marketable skills, education, capacity for employment, station in life, talents, financial and business ability, training,

experience, physical, emotional and mental capacity, the employment market for her particular training and skills, and whether she still has minor children living with her. If the trial court, upon allowing a petition for modification under section 510(a), finds that a spouse receiving maintenance is appropriately employed, it may reduce maintenance commensurate with her ability to gain financial independence; on the other hand, if the spouse receiving maintenance is able to work but unwilling to obtain appropriate employment and is not making a good-faith effort to gain financial independence, it may reduce or discontinue maintenance. Conversely, if the court finds that there is good reason for her inability to achieve full or partial financial independence, it may continue such maintenance and extend its duration.

Considering the age and condition of the parties, the standard of living achieved during the marriage and all relevant facts determined by the record, we do not find that the trial court abused its discretion in fixing the amount and duration of maintenance or that its findings were against the manifest weight of the evidence.

John also argues in his brief that the judgment restricts his right to seek modification under section 510(a) of the Dissolution Act (Ill. Rev. Stat. 1989, ch. 40, par. 510(a)). We do not agree. At any time, either party may seek modification of the maintenance award, and the judgment does not, in any way, restrict that right under the Act.

### VALUATION OF WALKER & WILLIAMS STOCK

The law firm of Walker & Williams had 100.5 shares of stock outstanding at the agreed date of valuation (May 22, 1987). John was the largest shareholder with 20 shares, which the trial court valued at $100,000. John argues that his shares are worth only $61,000 pursuant to the law firm's "Deferred Compensation and Buy/Sell Agreement" (Agreement) which was in effect at the time of the valuation. Robert Guilander, John's expert, stated in his evidence deposition that John's stock was worth $3,050.01 per share or $61,000.20 for 20 shares. Gary L. Krauss, Johanna's expert, also by evidence deposition, valued John's stock at $7,125 per share or $142,500.

Krauss has a bachelor's degree in accounting and a master's in finance, has been a certified public accountant since 1974, and has valued a number of professional corporations and businesses, although never a law firm. He testified that in placing a value on Walker & Williams' stock he relied on a publication written by Shannon Pratt (Valuing A Business: Analysis & Appraisal of Closely Held Corporations (1981)), which, he testified, was a commonly recognized source of methodology for valuing small and professional businesses. There

are 15 various methods of valuation, and of those methods, he used the net-asset-value approach and the excess-earnings method, then averaged the two together. Although he reviewed the agreement of Walker & Williams, he did not use the Agreement, or the value of the deferred compensation, in arriving at the per-share amount. Krauss testified that the Agreement was, in his opinion, a "friendly negotiated document between friendly parties who have as a sole purpose the continuation of a legal practice."

John alleged that Krauss did not use the valuation of a competent real estate appraiser in placing a value on the firm's real estate; did not consider the firm's older equipment or inspect its personalty; did not consider the Agreement or that he was a minority stockholder and could only sell to other members of the firm; and he used speculative assumptions.

The person testifying on behalf of John as to value of Walker & Williams stock was Robert E. Guilander. He received a bachelor's degree in accounting in 1963, has been a certified public accountant since 1981 and is presently self-employed. He was employed by the firm of Walker & Williams from 1971 until 1984 as the firm's tax accountant and office manager and continues to do the firm's income tax return. He testified that he had not previously valued a closely held corporation or reviewed appraisals regarding values of professional businesses. He further stated that in his opinion the Agreement was the most accurate method of valuing the shares.

Using Krauss' figures, he calculated the per-share value of stock under the:

(1) Agreement ($3,863.00);

(2) net-asset-value approach, but using the appraiser's value of the firm's real estate ($4,652.00); and

(3) excess earnings method, but using a replacement value of $137,500, with the value of the firm's library included ($4,501) and without the value of the library ($4,310).

Guilander testified that the firm usually contributed $150,000 to $160,000 to the profit-sharing account on June 30 of each year; however, in 1987, this sum was placed in a set-aside account of the firm prior to the marital property valuation date (May 22, 1987) and had not yet been turned over to the trustee of the account. He did not include that sum in valuing the stock and testified during cross-examination that if the sum had been included, it would increase his stated value by 50%.

In referring to the deferred compensation portion of the Agreement, it was Guilander's opinion that the sum provided "a type of sal-

ary" for an attorney withdrawing from the firm, and he did not, like Krauss, consider deferred compensation when arriving at per-share value. On cross-examination, he stated that his valuation reflected a mathematical computation based upon the information given to him by John; that he did not use his independent knowledge in arriving at the value of the firm's stock; and that he was unable to give an opinion as to whether Krauss' procedure used in compiling the value of stock was, or was not, in accordance with generally accepted accounting principles.

David Stutsman, a partner in Walker & Williams since 1955, testified that in 1983, several members left the firm and were paid $3,369.53 per share pursuant to the Agreement. He also testified, however, that during 1983, he sold two shares of stock to John for $10,094.01 per share which included a proportionate amount of deferred compensation. Guilander confirmed the sale of two shares by David Stutsman to John in 1983, at a price in excess of $10,000 per share.

The "Deferred Compensation and Buy/Sell Agreement" of Walker & Williams is the vehicle for acquiring a shareholder's interest in the event of death, disability, retirement or termination and provides a formula by which the value of a share is determined if one of those four events takes place. The trial court is not, however, required to use such an agreement in placing a value on marital property under section 503 of the Dissolution Act (Ill. Rev. Stat. 1987, ch. 40, par. 503). As the reviewing court stated in *In re Marriage of Olsher* (1979), 78 Ill. App. 3d 627, 397 N.E.2d 488, "[s]tock is usually valued at its market value, 'the price which a willing purchaser will pay to a willing seller in a voluntary transaction.' (*In re Estate of Voss* (1973), 55 Ill. 2d 313, 315, 303 N.E.2d 9[, 11].) Notably, market value is sometimes above and sometimes below the actual value of the stock. *In re Estate of Voss.*" (*Olsher*, 78 Ill. App. 3d at 635, 397 N.E.2d at 494.) The reviewing court in *Olsher* subsequently held that a buy/sell agreement was not evidence of value. An expert may base his or her opinion on scientific, technical or other specialized knowledge including facts and opinions contained in a learned treatise, firsthand observations, facts and opinions introduced into evidence, and facts and opinions not admitted into evidence when such facts or opinions are the types reasonably relied upon by experts in the field. *Wilson v. Clark* (1981), 84 Ill. 2d 186, 417 N.E.2d 1322.

In a two-volume text on divorce, the author, in commenting on valuation of professional practices and closely held corporations, stated: "The most successful method of appraising a business or pro-

fessional practice is not for the expert to use only one approach in estimating value, but to use several different approaches, just as a real estate appraiser may estimate one value based on comparable properties, and another based on replacement cost." (1 H. Gitlin, Gitlin on Divorce §8.09(E)(6), at 153 (1992).) Krauss did just that—he utilized two valuation approaches: the net-asset-value approach and the excess-earnings method, and he averaged the two together. He relied upon a publication which was usually relied upon by those making valuations of professional businesses and provided the court with an informed opinion. The trial court weighed the testimony of both experts, then valued the stock based upon the evidence.

Placing a fair market value on the professional corporation is an art, not a science, and the court must rely on expert witnesses to assist it in this difficult task. There is no exact formula that can be applied, so the trial court must rely on experts who may differ significantly in both methodology and valuation. The trial court must consider the relevant evidence before it; determine the credibility of the experts, the reasonableness of their testimony, the weight given to each of them, and their expertise in the particular area of valuation; and then determine fair market value.

■ We agree with the court in *Olsher*—a buy/sell agreement is not necessarily an indication of fair market value. In one sense, the value of a law firm is the totality of effort of those working in the firm and their present ability to produce income—it is not necessarily the value partners may place on it pursuant to a buy/sell agreement. Such a buy-out may, or may not, be what a willing buyer would pay to a willing seller, especially during an unfriendly termination of a stockholder from the firm. We note that the only sale of stock from one working partner to another was David Stutsman's sale of his two shares to John in 1983 for $10,094.01 per share. The sale did not take place under any of the four conditions listed under the Agreement—but rather, one partner sold to another at a mutually agreed price.

A review of the record clearly shows that the trial judge properly weighed the evidence of the parties' experts and had the advantage of being able to study the evidence depositions of each. We do not find that the trial court abused its discretion in valuing John's 20 shares at $5,000 per share or a total of $100,000, and we conclude its finding was not against the manifest weight of the evidence.

John also requested that we consider the case of *In re Marriage of Zells* (1991), 143 Ill. 2d 251, 572 N.E.2d 944, decided after briefs had been submitted. In *Zells*, the supreme court held, in part, that professional goodwill is not a marital asset subject to division or dis-

tribution. The court went on to explain: "Adequate attention to the relevant factors in the Dissolution Act results in an appropriate consideration of professional goodwill as an aspect of income potential. The goodwill value is then reflected in the maintenance and support awards." (*Zells*, 143 Ill. 2d at 256, 572 N.E.2d at 946.) In the case at bar, Johanna's expert testified he did not use goodwill in determining value and there is nothing in the record to indicate the trial court placed a value on the goodwill of the law firm as a marital asset.

### PROVISIONS CONCERNING DEFERRED COMPENSATION

John finally alleges as error an inconsistency between paragraph "H" of the judgment, which provides:

> "Defendant is ordered to name plaintiff as the irrevocable beneficiary of one-half ($\frac{1}{2}$) of the present value of his deferred compensation program with his employment,"

and paragraph "P" of the judgment order, which states:

> "Plaintiff is awarded an interest in the deferred compensation of the defendant, if and when he receives his deferred compensation, which equals:
>
> $$\frac{\text{No. of years married and participating in deferred compensation}}{\text{No. of years participating in deferred compensation}} \times \begin{array}{l}\text{50\% of amount of} \\ \text{deferred compensation received by defendant}\end{array}$$
>
> Counsel for plaintiff is ordered to prepare a qualified domestic relations order for its presentation to the Court."

John argues that the two paragraphs of the judgment require him to assign one-half of his deferred compensation to Johanna in paragraph "H" and the other one-half to her in paragraph "P." We do not agree. Paragraph "H" of the judgment directs John to name Johanna an irrevocable beneficiary in one-half of the deferred compensation as of the date of the dissolution, and paragraph "P" provides the formula by which Johanna is to receive her marital portion of the deferred compensation given to her under paragraph "H" when John receives his share upon retirement or his stock is otherwise sold.

For the reasons stated herein, the judgment of the trial court is affirmed.

Affirmed.

H. LEWIS and W. LEWIS, JJ., concur.