# Illinois Official Reports

## Appellate Court

---

### *In re Marriage of Schlichting*, 2014 IL App (2d) 140158

---

| | |
|---|---|
| Appellate Court Caption | *In re* MARRIAGE OF LARISA D. SCHLICHTING, a/k/a Larisa D. Fansler, Petitioner-Appellant, and BRUCE E. SCHLICHTING, Respondent-Appellee. |
| District & No. | Second District<br>Docket No. 2-14-0158 |
| Filed | September 29, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an appeal centered on an order awarding respondent petitioner's membership interest in a family-owned limited liability company that operated a rock quarry and had been deemed to be marital property by the trial court, the appellate court held that the trial court abused its discretion to the extent that the order required petitioner to violate the terms of the company's operating agreement, which specified the valuation process to be used in the case of a member's divorce and allowed a nonmember spouse to contest the valuation during the divorce process, since respondent had no interest in the company but members of his family did and respondent had a history of litigating against his family members; therefore, the appellate court reversed the trial court's order and directed petitioner to pay respondent the value of petitioner's interest as arrived at by the company's accountant pursuant to the terms of the operating agreement; furthermore, based on this ruling, adjustments were directed to be made for the parties' payments for postdissolution payments of taxes and capital contributions and receipts of postdissolution profits. |
| Decision Under Review | Appeal from the Circuit Court of Boone County, No. 10-D-38; the Hon. Brendan A. Maher, Judge, presiding. |

| | |
|---|---|
| Judgment | Reversed in part and vacated in part; cause remanded. |
| Counsel on Appeal | Nancy Grimme Schilling and Erin E. Walsh, both of Schilling & Walsh, LLP, of Rockford, for appellant. |
| | Robert C. Pottinger, of Barrick, Switzer, Long, Balsley & Van Evera, LLP, of Rockford, for appellee. |
| Panel | JUSTICE JORGENSEN delivered the judgment of the court, with opinion.<br>Justices Schostok and Birkett concurred in the judgment and opinion. |

**OPINION**

¶ 1      The trial court entered a judgment of dissolution of the marriage between Larisa D. and Bruce E. Schlichting. The court deemed Larisa's membership interest in Rockton Rock, LLC (the LLC), to be marital property. It awarded Bruce, a nonmember, all of Larisa's membership interest, but it ordered him to pay Larisa $19,500 in exchange. Larisa appeals, arguing that the trial court abused its discretion because the award required her to violate the LLC's operating agreement. This court stayed enforcement of the trial court's judgment pending appeal. For the reasons that follow, we reverse the trial court's judgment concerning the LLC. Accordingly, we also vacate the trial court's corresponding order that Bruce make capital contributions reflecting his membership interest and be awarded certain profits.

¶ 2                          I. BACKGROUND
¶ 3                A. Judgment of Dissolution and Memorandum of Decision
¶ 4      On April 1, 2011, the trial court entered the judgment of dissolution, ending the parties' 10-year marriage. The parties had no children, and the case mainly concerned property division. Of particular interest was the LLC, which owned and operated a quarry. Larisa held a 20% membership interest and several of Bruce's family members also held interests but Bruce did not. The record does specify why Bruce was not a member. However, there are several indications that Bruce had a history of litigating against his family. For example, Bruce's exhibit No. 31 is an agreed order stating that Bruce was to dismiss two pending lawsuits against two family members, who (personally or through other business relationships) happened to be members of the LLC.

¶ 5      The LLC's operating agreement contained a transfer restriction that prohibited Larisa, or any member, from selling to Bruce, or any person, a membership interest absent the unanimous written consent of the other members:

> "16.1A Member will not assign, sell, transfer, pledge, or otherwise encumber its Membership Interest, or any portion of its Membership Interest[,] without the unanimous prior written consent of the other Members."

¶ 6      The trial court determined that Larisa's membership interest in the LLC was marital property. The LLC had been discussed at trial, but very little evidence was presented concerning its value. The LLC's manager, Robert Schlichting, stated incidentally that he "felt" the company was worth approximately $400,000. The scarcity of valuation evidence was due to the parties' interpretation of the two-part valuation formula and buyout procedure contained in sections 16.6 and 16.4 of the LLC's operating agreement, which, in their view, rendered pointless the introduction of valuation evidence prior to the court's judgment of dissolution.

¶ 7      Section 16.6 stated in part:

> "16.6 In the event of a Member's divorce (if applicable), the same buyout procedure set forth in Section 16.4 shall apply, except that the value shall be the greater of said determination [by the LLC's accountant] or that amount determined by the final non-appealable decision in the divorce [by the court]. In the event the final non-appealable decision [by the court] concerning value is higher than the value calculated in Section 16.4 [by the LLC's accountant], *the divorcing Member shall execute a promissory note payable to the [LLC] for the difference in valuation*, which note shall be due and payable within ninety (90) days of said order." (Emphasis added.)

¶ 8      Section 16.4 stated in part:

> "16.4 In the event that a Member dies, declares bankruptcy, or receives a court declaration of incompetence, he or she shall receive the fair value of his or her membership interest as of the effective date of his or her resignation *as may be determined by the accounting firm regularly employed by [the LLC]*, utilizing the customary practices and principles associated with the operation and valuation of [the LLC's] assets and liabilities to the date of resignation." (Emphasis added.)

¶ 9      Therefore, in Larisa's view, there was no need to present valuation evidence, because, upon execution of the judgment of dissolution, that value would be "determined by the accounting firm regularly employed by [the LLC]." (Nor would it be in her interest to pursue a higher valuation, lest she be required to reimburse the LLC.)

¶ 10     In Bruce's view, there was no need to present valuation evidence, because, even if he were able to convince the court that the LLC was worth more than the amount determined by the LLC's accountant, he and Larisa would need to pay the LLC the difference in valuation. As Bruce argued at the trial:

> "It's all in the [operating agreement], though. There's going to be a fair value that's provided by *** whoever they designate as the accountant. *** So the point is that if we went through all the exercise of a valuation and all that cost ***, which would have been thousands of dollars, and we said it was something other than [the amount determined by the accountant] ***. The court would just find the value, and if it came

in higher then that would have been an obligation *of the parties*[1] to now write a note back to the LLC and pay it \*\*\*, so it's really a poison." (Emphasis added.)

¶ 11　　On August 31, 2011, the trial court entered its memorandum of decision. In it, the court awarded 65% of the "potential cash distribution from equity interest in the LLC" to Larisa and 35% to Bruce. This division was in keeping with an approximate 65/35 split of the entire marital estate. The trial court stated that the current value of the LLC was unknown:

> "The only evidence in the record with respect to the 'fair market value' of [the LLC] comes in the form of [LLC manager] Robert Schlichting's testimony that his 'feeling' is that the company is worth 'around $400,000.00.' According to the [LLC's operating agreement,] its fair market value will be determined by its accountant, Karl Barnes, upon completion of the parties' divorce."

¶ 12　　On September 21, 2011, the trial court entered an "order on remaining issues." As to the LLC, the court again stated: "[Larisa] is awarded 65% of the cash distribution from the equity interest in [the LLC]; [Bruce] is awarded 35% of the cash distribution from the equity interest in [the LLC]." Numerous motions and rulings followed the entry of the order and they can be divided into two groups: those aimed at effectuating the 65/35 split and those aimed at seeking reimbursement of expenses.

### B. Effectuating the 65/35 Split

¶ 14　　On October 11, 2011, Larisa moved to reconsider and for clarification. As to the LLC, she noted that there had not yet been a valuation, the implication being that she was unsure how to proceed. She stated that her membership interest had been valued (not necessarily before the court) as low as $15,000 and as high as $80,000.

¶ 15　　On October 21, 2011, Bruce moved to reconsider. As to the LLC, he asked that the court enter additional orders to effectuate the liquidation of Larisa's membership interest, which the parties referred to as a cash distribution:

> "The undisputed evidence is that the LLC is required to purchase the interest at fair market value. The issue becomes the enforcement of the Order and who should take the necessary steps to enforce the rights of the marital estate. Testimony was undisputed that Larisa wished to continue to hold her interest in [the LLC], whereas Bruce desired the interest be sold. \*\*\* Larisa does not have [any] interest in forcing the sale of the interest according to the terms of the Operating Agreement."

Although Bruce was not a member of the LLC, he requested that the court "enter an [o]rder requiring [him to] take all steps commercially necessary and reasonable to force the purchase of the shares [thereby allowing him to acquire a membership interest] according to the [o]perating [a]greement and the marital estate should reimburse [him] for any legal fees or other professional fees he incurs in [so doing]."

¶ 16　　On December 15, 2011, as to the motions to reconsider, the court ordered that "[Larisa] shall not liquidate, transfer, encumber[,] or otherwise dispose of any interest or contractual rights in [the LLC]." The court continued the matter as to the LLC.

---

[1] We note that section 16.6 actually states that the divorcing *member*, which Bruce was not, shall pay back the difference in valuation.

¶ 17    On January 25, 2012, Larisa moved to set the value of the LLC. Larisa noted that Barnes had determined the value to be $150,000, meaning that Larisa's cash distribution would be $19,500 ($150,000 x 0.20 x 0.65) and Bruce's cash distribution would be $10,500 ($150,000 x 0.20 x 0.35). Larisa stated that she and Bruce were entitled to be paid these amounts by the LLC.

¶ 18    As part of the posttrial process, the parties deposed Barnes. Barnes explained the $150,000 valuation. Barnes performed the valuation based on the "capitalization of earnings" method. This method is based on cash flows. It is a standard method, because "earnings inherently incorporate the assets and liabilities of a corporation." However, the method can be thought of as limited, because it does not necessarily account for the value of the assets independent of the manner in which they are used by the business. For example, the LLC's quarry might be worth more than its present use by the business reflects. The hypothetical offered was that there could be an undiscovered platinum mine underneath the quarry. Despite this limitation, Barnes preferred the capitalization-of-earnings method to any other, and he thought it fair for a 20% owner to be bought out for $30,000 (which, again, would result in $19,500 for Larisa and $10,500 for Bruce).

¶ 19    On February 15, 2012, in regard to the pending motions, the court entered an order stating that it "neither grant[ed] [n]or den[ied]" Bruce's requested relief concerning the LLC. Rather, it "specifically reserv[ed] issues relating to the liquidation of the [LLC] stock, including *** the distribution of the proceeds of any such liquidation and/or the right of one party to 'buy out' the other party's interest in the [LLC] *** by full payment to the selling party of the amount to which the selling party is entitled pursuant to the formula applied under the [o]perating [a]greement."

¶ 20    On March 6, 2012, Bruce responded to Larisa's motion to set the value of the LLC. Bruce stated that the value was "significantly higher" than $150,000. As such, he requested that the trial court allow him to buy out Larisa's membership interest for $19,500, and that Larisa be ordered to "transfer all right, title[,] and interest in [the LLC], including and without limitation, an irrevocable power of attorney to pursue any and all rights [she] has had in the past, has currently[,] or will acquire in the future as a result of her ownership interest in [the LLC]." In Bruce's view, acquiring a membership interest would enable him to pursue a greater buyout based on a valuation closer to the $400,000 mentioned at trial.

¶ 21    On March 16, 2012, at the hearing on the pending matters, Larisa responded to Bruce's request to buy her membership interest for $19,500. Larisa did not believe that the court had authority to dispose of the interest in that manner, stating:

> "The LLC is under its own operating agreement, which prohibits any transfers without approval by the other members of the LLC. *** It is my understanding *** that the other members of the LLC have said they don't want Bruce to be part of the LLC, and, therefore, don't approve of transferring [Larisa's] rights to [Bruce]."

While Larisa did not believe that the operating agreement allowed for Bruce to buy her membership interest, she did believe that she could pay Bruce for his 35% share of the cash distribution. She was *already* a 20% member; the other members did not need to approve her membership. Larisa proposed that she, rather than the LLC, would provide Bruce with a $10,500 payment. This would allow her to retain her 20% membership interest.

¶ 22    Regarding its authority to grant Bruce's request to buy Larisa's membership interests for $19,500, the trial court stated:

"[T]o address the *** issue of whether I have *** authority to do it, people assign *** rights to other people all the time. *** In divorce court[,] I get to assign *** people's interest in things. *** And those rights presumably include the right to litigate, the ability to say we don't think the valuation was done correctly. We think that, you know, we're contesting valuation. And we're now, by way of assignment in the dissolution case, we get to stand in her shoes and argue whatever she would have under this."

¶ 23    On March 20, 2012, the trial court entered what it thought would be its final order to effectuate a 65/35 cash distribution of the membership interest. On September 11, 2012, on Larisa's motion to reconsider, it finalized its plan to effectuate the cash distribution. In it, the court summarized the parties' positions to date:

"From April 2012 to the present, the parties, through their respective counsel, have made efforts to reach an agreement ***. *** Larisa has, through that process, made it clear that she does not want to litigate against the LLC with Bruce [in his attempt to maximize the value of the LLC]; instead, she wants to be paid the value of her membership interest in the LLC and be absolved of further potential liability that may arise in connection with any efforts Bruce may make to avoid the effect of Karl Barnes's valuation under the LLC's operating agreement."

With the parties' wishes in mind, the court essentially ordered that the cash distribution be effectuated through an intermediate step, wherein Larisa would sell her membership interest directly to Bruce. Bruce then would be free to pursue a higher valuation of the LLC and, by exercising his right as a member, effectuate a cash distribution at a later date.

¶ 24    Specifically, the order stated in pertinent part: (1) "based specifically on Larisa's express request to be paid $19,500 as and for the value of her share of the LLC ***, the court GRANTS Larisa's 'Motion to Set Value of Rockton Rock, LLC ***' at the sum of [$150,000] and finds that she is entitled to $19,500"; (2) Bruce shall pay Larisa $19,500, effectuating the cash distribution as to Larisa; (3) as to Bruce, "[u]pon payment to Larisa of $19,500, Bruce is (to the extent this court is authorized to make such an award under the [dissolution statute]) awarded all of Larisa's marital right, title[,] and interest in and to her membership/stock interest in the LLC, including all of her rights and responsibilities under the LLC's operating agreement. This final order does not purport to award Bruce any greater or lesser rights than Larisa has or has had as a member of the LLC; rather, this final order *** only permits Bruce to 'stand in Larisa's place' for purposes of negotiating with, or litigating against, the LLC"; and (4) Bruce will defend, indemnify, and hold Larisa harmless from any and all costs, expenses, or judgments incurred as a result of Bruce's efforts to avoid the effect of Barnes's valuation of Larisa's membership interest and to otherwise maximize the value of that interest. The trial court concluded that its order disposed of the " 'last pending post-judgment motion directed against [the parties' Order on Remaining Issues].' " Further, "[w]ith the entry of this Final Order on reconsideration, the last issue this Court 'reserved' within the September 21, 2011, *** February 15, 2012, *** and *** March 20, 2012, [orders] has been resolved and decided, subject only to enforcement proceedings. [Citations.]" The trial court did not make a finding pursuant to Illinois Supreme Court Rule 304(a) (eff. Feb. 26, 2010).

¶ 25    On October 10, 2012, Larisa filed her notice of appeal, and this court stayed enforcement of the trial court's judgment pending the outcome.

- 6 -

¶ 26                    C. Pending Motion for Reimbursement

¶ 27         Meanwhile, as the court was entering the aforementioned series of orders aimed at effectuating the 65/35 distribution of the membership interest, Larisa filed a motion requesting relief for shouldering the responsibility of preserving her membership interest although the court had deemed it marital property.

¶ 28         Specifically, on August 8, 2012, Larisa filed a motion for reimbursement of expenses. The expenses pertained to capital contributions she paid to the LLC in her capacity as a member, minus profit distributions she received from the LLC. Larisa listed the dates of the contributions, some of which were paid prior to the 2011 judgment of dissolution and some of which were paid after. In 2010, Larisa contributed $24,200 and received no profit distributions. Because the contribution was made prior to the dissolution, she sought a 50% reimbursement from Bruce in the amount of $12,100. In 2011, subsequent to the judgment (but before the August 31, 2011, memorandum of decision), Larisa contributed $11,600 and received $4,200 in profit distributions. (The $11,600 contribution was made with the court's express permission as part of the judgment of dissolution. The court stated that the $11,600 contribution was to be made at Larisa's "discretion.") Because the contribution was made subsequent to the dissolution, she sought from Bruce a 35% reimbursement in the amount of $4,060 ($11,600 x 0.35), minus 35% of the profit distribution, in the amount of $1,470 ($4,200 x .35), for a total of $2,590. (The parties represent that, although Bruce did not pay the $4,060 for the capital contribution, he did receive the $1,470 profit distribution.)

¶ 29         On August 22, 2012, the trial court set the motion for hearing. The scheduled date was September 19, 2012.

¶ 30         On August 29, 2012, Bruce filed, under section 2-615 of the Code of Civil Procedure, a motion to dismiss Larisa's motion for reimbursement. 735 ILCS 5/2-615 (West 2012). Bruce argued that it was "impossible" for him to respond to Larisa's motion, because she cited no statutory provision to support it. Additionally, each fact she cited occurred before the close of evidence in this case. Bruce further argued that it was not clear whether Larisa's motion: (1) intended, but failed, to state a cause of action and was, therefore, subject to a section 2-615 dismissal; or (2) intended to seek enforcement of a judgment.

¶ 31         On September 11, 2012, as mentioned above, the trial court entered its final order to effectuate the 65/35 split, claiming to dispose of all postjudgment motions directed against the September 21, 2011, order on remaining issues. However, the court did not address Larisa's motion for reimbursement. (Again, that matter had been set for hearing the next week on September 19, 2012. For whatever reason, that hearing was postponed.)

¶ 32         On October 3, 2012, Larisa filed a response to the motion to dismiss. This time in support of her motion for reimbursement, she cited section 503(d)(1) of the Illinois Marriage and Dissolution of Marriage Act, which states that, in dividing marital property, the court shall consider the contribution of each party to the preservation of the value of the property. 750 ILCS 5/503(d)(1) (West 2010). She did not answer Bruce's question as to whether, in her motion for reimbursement, she intended to file a cause of action or a motion for enforcement.

¶ 33         Larisa raised arguments similar to those she raised in her motion for reimbursement. However, she clarified that the 2010 contribution had been paid out of the "Alpine Asset Management Account," which the court had subsequently deemed marital property. She criticized as hypocritical Bruce's minimization of the importance and relevance of her request, noting that Bruce, too, had earlier asked the court to account for the LLC's 2011

profits and losses. As to Bruce's request, on February 15, 2012, the court had held that it could not yet account for 2011 profits and losses, as it did not yet have any evidence as to what they were. As to the 2010 contribution, it had instructed that, in order to maintain the 65/35 division (and to whatever extent Larisa had personally paid the 2010 contribution), Bruce must incur 50% of the burden. Likewise, Bruce would be entitled to 50% of the profits.

¶ 34    On October 19, 2012, the trial court conducted a hearing on Larisa's motion for reimbursement. However, the court stated that it had no jurisdiction to decide the matter because, as of Larisa's October 10, 2012, notice of appeal, jurisdiction belonged with the appellate court.

¶ 35                                    D. Appeal No. 2-12-1117

¶ 36    Larisa appealed the trial court's September 11, 2012, order, which had attempted to effectuate the 65/35 split of the interest in the LLC. *In re Marriage of Schlichting*, 2013 IL App (2d) 121117-U, ¶ 2. However, this court held that the appeal was premature. *Id*. ¶ 45. No Rule 304(a) finding accompanied the order and therefore Larisa's pending motion for reimbursement deprived this court of jurisdiction. *Id*. ¶ 44. We dismissed the appeal, leaving jurisdiction with the trial court. *Id*. ¶ 45.

¶ 37                          E. Ruling on the Motion for Reimbursement

¶ 38    On November 7, 2013, Larisa noticed up her prior motion for reimbursement. On November 8, 2013, Larisa moved more specifically for reimbursement for capital contributions incurred *after* the 2011 judgment of dissolution.

¶ 39    On January 22, 2014, the trial court granted Larisa partial relief by ordering that, from August 31, 2011,[2] forward (presumably until the September 11, 2012, order that required her to sell her membership interest to Bruce), Larisa and Bruce share, in a 65/35 division, both the burden of capital contributions and taxes and the benefit of profit distributions. The court denied Larisa reimbursement for the $11,600 contribution she made with personal funds after the dissolution but before August 31, 2011. It also denied Larisa reimbursement for contributions she made prior to the dissolution, noting that Larisa had used marital funds to preserve a marital asset.

¶ 40    Also on January 22, 2014, the trial court tied up remaining matters related to the September 11, 2012, order. It denied Larisa's renewed motion to reconsider. As a precaution, it entered a Rule 304(a) finding. Finally, it denied Larisa's request to stay enforcement of the order pending appeal. This court then reversed the denial of the stay, and we now accept Larisa's appeal.

¶ 41                                      II. ANALYSIS

¶ 42    Larisa appeals both the trial court's September 11, 2012, order requiring her to sell to Bruce her membership interest and the January 22, 2014, order denying her reimbursement of capital contributions.

_____

[2]On August 31, 2011, the court ordered a general 65/35 split of the cash distribution. However, the dissolution occurred earlier, on April 1, 2011.

A. The September 11, 2012, Order

¶ 44     As to the September 11, 2012, order, Larisa complains that the court ordered her to violate the operating agreement's transfer restriction, which stated that a member could not transfer or sell any portion of his or her membership interest without the unanimous written consent of the other members (section 16.1). Larisa argues that the court-ordered sale was particularly unnecessary because the operating agreement, through its two-part valuation formula and buyout procedure, already provided for the distribution of a member's interest upon divorce (sections 16.6 and 16.4). Larisa acknowledges that the question before us is not whether the trial court itself was absolutely required to abide by the terms of the operating agreement. Rather, the question is whether the court's manner of distribution, which required Larisa to violate the operating agreement, constituted an abuse of discretion. *In re Marriage of Banach*, 140 Ill. App. 3d 327, 331 (1986).

¶ 45     As will be explained, we agree that the court's order to violate a reasonable operating agreement was an untenable resolution, particularly where other options were available. Based on this and other factors, such as the court's indulgence in the parties' misinterpretation of the valuation formula and buyout procedure and the court's failure to mitigate against future conflict, we find that the court abused its discretion.

¶ 46          1. The Court Ordered Larisa to Violate the Operating Agreement

¶ 47     As a threshold matter, we determine that the trial court clearly ordered Larisa to violate the terms of the LLC's operating agreement. Again, the operating agreement prohibited the sale of any portion of a membership interest without the unanimous written consent of the other members (section 16.1). Contrary to this provision, the court ordered Larisa to sell her membership interest to Bruce without the unanimous consent of the other members. The operating agreement also required that the LLC buy out a divorcing member's interest (sections 16.6 and 16.4). Contrary to these terms, the court did not allow the *LLC* to buy out Larisa's interest; rather, it allowed *Bruce*, a nonmember, to buy out Larisa's interest.

¶ 48     Bruce intimates, without citation to the record or legal authority, that his purchase of Larisa's interest without the unanimous consent of the other members did not violate the operating agreement's transfer restriction, because, in his view, Larisa herself had no interest aside from her right to a cash distribution or buyout. See Ill. S. Ct. R. 341(h)(7) (eff. Feb. 6, 2013) (arguments must be supported by citation to authority). Forfeiture aside, even if Bruce's premise is true, his argument fails because the transfer restriction prohibits the sale of "any portion" of a membership interest without the unanimous consent of the other members. Larisa's right to a cash distribution or buyout represents at least a "portion" of her membership interest.

¶ 49               2. Misinterpretation of the Operating Agreement's
                       Valuation Formula and Buyout Procedure

¶ 50     We next address an error that occurred relatively early in the proceedings, a misinterpretation of the valuation formula and buyout procedure (sections 16.6 and 16.4). This error is important because the trial court crafted its September 11, 2012, order so that Bruce could pursue a valuation greater than that submitted by Barnes. The court apparently

entertained Bruce's view that, if the court entered a greater valuation, the LLC would, subsequent to the divorce proceedings and outside the court's oversight, require Bruce and Larisa to pay back the difference in valuation. Contrary to the parties' interpretation, the court did not need to award Bruce a membership interest in order to provide Bruce with a means by which to pursue a greater valuation.

¶ 51 Again, in Bruce's view, there was no need to present valuation evidence, because, even if he were able to convince the court that the LLC was worth more than the amount determined by Barnes, the operating agreement would require that he and Larisa pay the LLC the difference in valuation. In Larisa's view, there was no need for the court to make a value determination because, upon entry of the judgment of dissolution, that value would be determined by Barnes.

¶ 52 For the reasons that follow, however, these views, particularly Bruce's, are not in keeping with the clear and unambiguous terms of the valuation formula and buyout procedure. When interpreting the agreement, we must give its clear and unambiguous terms their ordinary and natural meaning. *Owens v. McDermott, Will & Emery*, 316 Ill. App. 3d 340, 344 (2000).

¶ 53 Again, the valuation formula and buyout procedure states:

"16.6 In the event of a Member's divorce (if applicable), the same buyout procedure set forth in Section 16.4 shall apply, except that the value shall be the greater of said determination [by the LLC's accountant] or that amount determined by the final non-appealable decision in the divorce [by the court]. In the event the final non-appealable decision [by the court] concerning value is higher than the value calculated in Section 16.4 [by the LLC's accountant], *the divorcing Member shall execute a promissory note payable to the [LLC] for the difference in valuation*, which note shall be due and payable within ninety (90) days of said order." (Emphasis added.)

And:

"16.4 In the event that a Member dies, declares bankruptcy, or receives a court declaration of incompetence, he or she shall receive the fair value of his or her membership interest as of the effective date of his or her resignation *as may be determined by the accounting firm regularly employed by [the LLC]*, utilizing the customary practices and principles associated with the operation and valuation of [the LLC's] assets and liabilities to the date of resignation." (Emphasis added.)

¶ 54 Contrary to Bruce's view, section 16.6 states that the divorcing member, which Bruce is not, shall pay back the LLC the difference in valuation. Therefore, if the court set a higher valuation, the LLC would be required to buy out Larisa at that valuation, and only Larisa would be required to pay back the LLC the difference in valuation. In other words, a divorcing member is bound by the LLC's accountant's valuation, but the divorcing nonmember gets to walk away with his or her share of the higher, court-ordered valuation. It would not have been pointless for Bruce to have submitted evidence in hopes of obtaining a higher, court-ordered valuation.

¶ 55 For example, without ruling that the trial court itself was bound by the operating agreement, we illustrate how a separate action to enforce the operating agreement would likely play out. In a best-case scenario for Bruce, *if* the trial court had valued the LLC at $400,000, then the LLC would buy out Larisa at $80,000 ($400,000 x 0.20). The court

deemed the 20% membership interest to be marital property, so Bruce would receive $28,000 ($80,000 x 0.35). Bruce would walk away with that $28,000, which is $17,500 more than the $10,500 he would have received under Barnes's $150,000 valuation. Larisa would then have to reimburse the LLC in the amount of $50,000 ($80,000 - $30,000, the difference between the buyout under the court's valuation and the buyout under Barnes's valuation).

¶ 56    Contrary to Larisa's view, the operating agreement explicitly contemplates a value determination from a divorce court, even if that valuation amounts to an endorsement of the accountant's valuation. Section 16.6 states that the valuation "*shall be the greater of* said determination [by the LLC's accountant] *or* that amount determined by the final non-appealable decision in the divorce [by the court]."[3] (Emphases added.) Which valuation is greater cannot be determined unless the court makes a valuation based on the evidence. Moreover, had the court made an independent valuation at an earlier stage in the proceedings, it would have been in a better position to offset Larisa's foreseeable reimbursement to the LLC by awarding her other marital assets, thereby effectuating its intended overall 65/35 distribution scheme. See, *e.g.*, *Banach*, 140 Ill. App. 3d at 331 (where property, such as a business, is not susceptible to division in kind or where such division would lead to inequities, the court may, in its discretion, award the property to one spouse, subject to payment to the nonacquiring spouse for the interest lost, either by offsetting other marital property or by cash).

¶ 57    We recognize that Bruce would be impacted by a reimbursement to offset a difference in valuation *if* the parties used marital funds to reimburse the LLC for any difference. However, we see no reason why that need be the case. Just as postdissolution capital contributions can come from (Larisa's) personal funds, a postdissolution reimbursement for a difference in valuation, if applicable, can also come from (Larisa's) personal funds.

### 3. The Court Abused Its Discretion
### by Ordering Larisa to Violate the Operating Agreement

¶ 59    Having established that the trial court ordered Larisa to violate the operating agreement and that this was not necessary to allow Bruce to pursue a higher valuation, we now explain why the order constituted an abuse of discretion, requiring reversal.

¶ 60    While no Illinois case *requires* a court to distribute marital property in accordance with an operating agreement binding one or both of the parties in their business activities, existing case law, both within and outside Illinois, comes together to establish that the failure to do so, where compliance is easily possible, constitutes an abuse of discretion. See, *e.g.*, *Shrock v. Meier*, 2012 IL App (1st) 111408-U, ¶ 23 (in considering whether the trial court abused its discretion in modifying an injunction, the appellate court considered whether the trial court's ruling was consistent with the terms of the operating agreement by which the parties were bound).

¶ 61    Generally, when distributing marital property, the court should seek a high degree of finality so that the parties can plan their future with certainty and are not encouraged to return to court. *In re Marriage of Hellwig*, 100 Ill. App. 3d 452, 459 (1981). Distribution of a

---

[3]We take the phrase "non-appealable decision" to mean a determination that stands after avenues for review have been exhausted.

- 11 -

business interest can present difficulties, and the court should be mindful that divorcing parties might be unable to work together in a continued business association. *In re Marriage of Moll*, 232 Ill. App. 3d 746, 754 (1992). In *Castonguay v. Castonguay*, 306 N.W.2d 143, 146 (Minn. 1981), the court held that, even though the company's operating agreement did not apply to court-ordered transfers, the trial court could not simply transfer without restriction shares of the business to the nonmember spouse. The court stated that to do so constituted an abuse of discretion; the forced admittance of an unwelcome ex-spouse to the affairs of a closely held corporation could be disruptive. *Id*. Therefore, the court remanded, directing the trial court to effectuate the placement of the nonmember spouse's shares in a voting trust so as to lessen the potential discord in the business. *Id*. As *Moll* and *Castonguay* caution, a trial court should craft an order not only so as to avoid a return to divorce court, but also so as to avoid future conflict in general. To terminate litigation in one court only to precipitate it in another is not in keeping with the general policy in favor of finality.

¶ 62    Here, although the trial court discouraged future litigation involving Larisa, it did not discourage future litigation involving Bruce. To the contrary, the court's order allowed and even encouraged Bruce, who already had a history of initiating litigation against the family business(es), to pursue future litigation: "this final order *** permits Bruce to 'stand in Larisa's place' for purposes of negotiating with, or litigating against, the LLC." Additionally, although the court's aim was to allow for an eventual cash distribution, its order did not effectuate with finality the cash distribution. Instead, it effectively passed jurisdictional oversight of the matter to the general civil courts, should Bruce rely upon his membership interest to establish standing to pursue litigation against the LLC.

¶ 63    Also, generally, an LLC operating agreement is to be enforced according to general contract principles, unless it conflicts with a statute. See, *e.g.*, *Downs v. Rosenthal Collins Group, L.L.C.*, 385 Ill. App. 3d 47, 52 (2008) (operating agreement to be treated as contract); 1 Larry Ribstein & Robert Keatinge, Limited Liability Companies § 4:16 (2d ed. 2013). And, a court should not interfere with the terms of a contract that parties entered into freely. See, *e.g.*, *Prudential Insurance Co. of America v. Van Martre*, 158 Ill. App. 3d 298, 311 (1987) (a party cannot enlist the support of the judiciary to reform a contract).

¶ 64    The provisions at issue here, section 16.1 and sections 16.6 and 16.4 together, may be thought of as a buy-sell agreement. Creating a buy-sell agreement is a means by which to coordinate estate and family planning with business succession goals. Jonathan C. Lurie & Edwin G. Schuck, Jr., *Valuation*, A.L.I.-A.B.A. Course of Study, Estate Planning in Depth, ¶ 100.1 (2007). A buy-sell agreement, whether standing on its own or, as here, part of an LLC's operating agreement, may be used to govern relations between co-owners of a business, establishing rules or guidelines for valuing the business, transferring ownership, and negotiating a price before the identity of the seller and purchaser are known. *Id*. at 1359-60.

¶ 65    Larisa cites authority mandating that transfers occur as set forth in a buy-sell or operating agreement. For example, the Limited Liability Company Act (Act) requires that transfers of company interest must be made in accordance with the operating agreement or all other members' consent. 805 ILCS 180/30-10 (West 2012). Larisa acknowledges that this authority governs transfers, absent a court order, among members or between members and other categories of persons or entities (often referred to as voluntary transfers). It does not

govern the type of transfer at issue here, a court-ordered transfer (often referred to as an involuntary transfer).

¶ 66    Cases specifically addressing potential conflict between a marital dissolution order and an operating agreement are few. Illinois courts have approached the issue, flagging it as a potential problem but ultimately avoiding a direct ruling. See, *e.g.*, *In re Marriage of Devick*, 315 Ill. App. 3d 908, 920 (2000); *In re Marriage of Gunn*, 233 Ill. App. 3d 165, 182-84 (1992). In *Devick* and in *Gunn*, the court determined that there *was no conflict* between the marital dissolution order and the operating agreement. Thus, the court affirmed the court-ordered transfer without reaching the question of whether the trial court *would have* abused its discretion had it ordered a transfer that conflicted with the operating agreement. Specifically, in *Devick*, the operating agreement's transfer restriction expressly exempted court-ordered transfers. *Devick*, 315 Ill. App. 3d at 920. Therefore, the trial court remained within the bounds of the operating agreement in ordering a transfer that would have been prohibited if it had been performed without a court order. *Id*. (Additionally, in *Devick*, the company was made a third-party defendant in the divorce proceedings so that it was able to protect its own interests.) In *Gunn*, the operating agreement's valuation formula specified as triggering events death, disability, retirement, and termination, but *not* divorce. In addition, the valuation formula did not specify whether it applied to a divorce court's valuation. *Gunn*, 233 Ill. App. 3d at 182-84. Therefore, the divorce court's valuation process did not necessarily conflict with the valuation process set forth in the operating agreement.

¶ 67    Other jurisdictions have taken the issue one step further by stating that, in distributing interest in a company, a divorce court should honor the company's operating agreement and any transfer restrictions contained therein. See, *e.g.*, *Bryan-Barber Realty, Inc. v. Fryar*, 461 S.E.2d 29, 32 (N.C. Ct. App. 1995); *Castonguay*, 306 N.W.2d at 146. Although *Fryar* and *Castonguay* stated this rule, neither directly applied it. Each found that the transfer restriction at issue did not apply to court-ordered transfers. Specifically, in *Fryar*, the court held that an operating agreement's transfer restriction did not apply to court-ordered transfers, *unless* that transfer restriction expressly prohibited court-ordered transfers. *Fryar*, 461 S.E.2d at 32. In *Castonguay*, the court held the same. *Castonguay*, 306 N.W.2d at 146.

¶ 68    Here, the buy-sell agreement *does* apply to, or account for, court-ordered transfers. Sections 16.6 and 16.4 set forth procedures for the LLC to accommodate a court-ordered distribution of a membership interest that will not conflict with the transfer restriction set forth in section 16.1. In other words, the buy-sell agreement was drafted to "minimize the risk that [the] divorce court [would] cast [it] aside in determining the value of and allocation of business interests in divorce." Raiford D. Palmer, *Valuation and Division of Business Assets in Divorce*, 20 Du Page County Bar Ass'n 10 (2007); *cf. Gunn*, 233 Ill. App. 3d at 182-84 (buy-sell agreement set forth triggering events that did not include divorce). We see no reason why the trial court should have entered an order that conflicted with the terms of the operating agreement when the operating agreement specified the valuation process in the event of a divorce and allowed for the nonmember spouse to contest the valuation during divorce proceedings. Entering the order was an abuse of discretion.

¶ 69    In sum, our holding is consistent with: (1) existing policy favoring finality in divorce proceedings and discouraging future conflict (here, the trial court continued, rather than resolved, the debate over valuation, encouraged future litigation in the matter, and inserted an ex-spouse into a business environment where he was not wanted by other business members

and where he had no rights outside the court order); (2) existing principles concerning the freedom to enter into contracts (here, the trial court's order forced Larisa to violate the terms of the operating agreement, and courts should not interfere with the terms of an agreement that parties enter into freely); and (3) developing case law concerning the avoidance of potential conflict between marital dissolution orders and business operating agreements (*Devick*, *Gunn*, *Fryar*, and *Castonguay*). The trial court abused its discretion in ordering a property distribution that would require Larisa to violate the terms of the operating agreement where it could have easily and equitably avoided doing so.

¶ 70    The cases cited by Bruce do not convince us otherwise, because, unlike the four persuasive cases cited by Larisa (*Devick*, *Gunn*, *Fryar*, and *Castonguay*), they do not even mention potential conflict between the distribution of marital property and an operating agreement binding one or both of the parties in their business activities. See, *e.g.*, *Banach*, 140 Ill. App. 3d 327 (the court had the authority to grant each spouse an option to buy out the other's interest in their *jointly* owned restaurant and home); *Hellwig*, 100 Ill. App. 3d at 459 (the court's award to the wife of a 40% interest in the husband's business was an "illusory division" where it did not set the time or manner for valuation and receipt of funds); *In re Marriage of Simmons*, 87 Ill. App. 3d 651 (1980) (where *no* operating agreement or transfer restriction was at issue, the court was authorized to order the husband to execute one of two options: transfer stock to the wife or pay her $6,000 for the value of the same).

¶ 71                                    4. Remedy

¶ 72    Having found that the trial court's order was made in error, we now turn to the remedy. Because this court stayed enforcement of the trial court's order, we do not need to order the "undoing" of any transactions effectuating Bruce's LLC membership. The court's aim of an eventual cash distribution to Bruce was valid; its method of ordering that Bruce would first obtain Larisa's membership interest in the LLC was not valid. In other words, Bruce is entitled to a portion of the cash value of the membership interest, but not an actual membership interest. This court, therefore, looks for the most efficient way to compensate Bruce for his 35% portion of Larisa's membership interest.

¶ 73    Again, where marital property, such as a business, is not susceptible to division in kind, the court may award the property to one spouse, subject to payment to the nonacquiring spouse for the interest lost, either by offsetting other marital property or by cash. *Banach*, 140 Ill. App. 3d at 331. Here, other marital property is no longer available because the court isolated the LLC issue. Cash, by Larisa's representation, is available. If Larisa happens not to have the cash, she can attempt to force a buyout between herself and the LLC per the terms of the operating agreement in an independent proceeding. Larisa's relationship with and membership in the LLC is between her and the LLC.

¶ 74    As to the amount of cash due, Bruce is bound by Barnes's $150,000 valuation resulting in a $10,500 payment. Valuation of marital property is a question of fact, not to be disturbed if in the range of competent evidence presented at trial. *Moll*, 232 Ill. App. 3d at 752. It is the parties' burden to present valuation evidence. *Id*. An appellate court will not remand for an evidentiary hearing on value when a party had ample opportunity to present valuation evidence and failed to do so. *Id*.

¶ 75    Here, Bruce recognized that he could have submitted valuation evidence but declined to do so. Nevertheless, Bruce challenged Barnes's valuation, exposing limitations in

- 14 -

methodology. The trial court considered Barnes's valuation, ultimately granting Larisa's motion to set the LLC's value at $150,000. Bruce had an opportunity to present different valuation evidence and, based on his erroneous interpretation of the valuation formula, he chose not to take it. The only hints in the record that the LLC could be worth significantly more were: (1) Robert Schlichting's comment that he "felt" the LLC was worth $400,000 (which would have resulted in an increase of $17,500 to Bruce); and (2) the possibility that the quarry could be worth more if used in a different manner (presumably meaning if it were used for something other than standard excavating). These do not prompt us to overlook the rule set forth in *Moll* and to remand, based on equitable considerations, for an evidentiary hearing on value. Robert Schlichting's "opinion" was undeveloped and unchallenged; Barnes's valuation, in contrast, was based on facts and established methodology and was subject to cross-examination. The only suggested basis for an increased valuation of the LLC was the hypothetical possibility that there might be an undiscovered, underground platinum mine. This, of course, is highly speculative.

¶ 76    In sum, we hold that the trial court abused its discretion in its distribution of Larisa's membership interest in the LLC. We reverse that portion of its order and direct Larisa to pay Bruce $10,500 for his claim to the interest as marital property. Whether Larisa accomplishes this with personal funds or by forcing the LLC to buy her out to free up cash is between her and the LLC.

¶ 77                                          B. The January 22, 2014, Order

¶ 78    Based on this ruling in favor of Larisa, we must vacate that portion of the trial court's January 22, 2014, order requiring Bruce to pay 35% of the postdissolution LLC taxes and capital contributions and awarding him 35% of the profits. Any postdissolution capital contributions Bruce has made should be returned to him, and any postdissolution profits he has received (we note that there was at least a $1,470 distribution) should be returned to Larisa. If need be, these amounts may offset or be offset by the $10,500 Larisa will pay Bruce. Although the trial court's order that Larisa alone was responsible for the $11,600 capital contribution due after the dissolution but before August 31, 2011, might have been inconsistent with its order that Bruce obtain the membership interest and receive profits during that same time period, any problem caused by this inconsistency is vitiated by our overall holding that Bruce should not obtain the membership interest. Bruce should not become a member of the LLC; thus he is not responsible for its postdissolution expenses, and he is not entitled to its postdissolution profits. Finally, no remedy is needed for the capital contributions made *prior* to the dissolution. As we stated in our last order, Larisa used marital funds to preserve a marital asset. *Schlichting*, 2013 IL App (2d) 121117-U, ¶ 37. Therefore, Larisa did not incur any personal debt to preserve a marital asset.

¶ 79                                          III. CONCLUSION

¶ 80    For the aforementioned reasons, the trial court's September 11, 2012, order as to the LLC is reversed; its January 22, 2014, order is vacated in part; and the cause is remanded for proceedings consistent with this opinion.

¶ 81    Reversed in part and vacated in part; cause remanded.