2023 IL App (2d) 230210-U
No. 2-23-0210
Order filed November 7, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| *In re* MARRIAGE OF SALBI HUSSAIN, | ) | Appeal from the Circuit Court |
| | ) | of McHenry County. |
| Petitioner-Appellant, | ) | |
| | ) | |
| and | ) | No. 21-DV-499 |
| | ) | |
| TAMARA ALI, | ) | Honorable |
| | ) | Justin M. Hansen, |
| Respondent-Appellee | ) | Judge, Presiding. |

_____

JUSTICE MULLEN delivered the judgment of the court.
Justices Jorgensen and Birkett concurred in the judgment.

**ORDER**

¶ 1    *Held*:  (1) The trial court did not err in valuing marital business where the parties failed to present any meaningful evidence as to the value of the business, (2) the trial court's determination of husband's gross monthly income was not against the manifest weight of the evidence, (3) husband's failure to provide the reviewing court with a sufficiently complete record on appeal required the reviewing court to presume the trial court's ruling as to the division of the parties' retirement accounts conformed to the law and had a sufficient factual basis, and (4) the trial court did not abuse its discretion in allocating the parties' parental responsibilities.

¶ 2    Petitioner, Salbi Hussain, appeals from a judgment of the circuit court of McHenry County dissolving his marriage to respondent, Tamara Ali. Petitioner argues that the trial court erred in (1) valuing the marital business, (2) determining his income for support purposes, (3) dividing the

parties' retirement accounts, and (4) allocating the parties' parental responsibilities. Finding none of petitioner's arguments persuasive, we affirm the judgment of the circuit court.

¶ 3                                I. BACKGROUND

 ¶ 4                            A. Pretrial Proceedings

¶ 5       The parties married on July 3, 2004. Two children were born during the marriage, S.S. (born on September 14, 2007), and Y.S. (born on October 28, 2011). On July 6, 2021, petitioner filed a petition for dissolution of marriage in the circuit court of McHenry County. On August 6, 2021, respondent filed a verified counterpetition for dissolution of marriage in the same court, and a verified petition for exclusive possession of the marital residence in Algonquin, allocation of parental responsibilities and parenting time, maintenance, and child support. In pretrial proceedings, the trial court granted respondent exclusive possession of the marital residence, finding by a preponderance of the evidence that respondent's and the children's "mental [and] physical health will be jeopardized by the Petitioner's occupation in the marital residence"; entered an agreed order appointing Paulette Gray as guardian *ad litem* (GAL) for the children and ordering her to submit a report addressing the following issues: (1) temporary and permanent decision making, (2) temporary and permanent parenting time allocation, and (3) any other child-related issues; and provided respondent temporary financial relief, including unallocated support in the amount of $750 per month. The court also ordered petitioner to pay certain expenses for the marital residence, including the mortgage, property taxes, insurance, and certain utilities.

¶ 6       On November 1, 2021, petitioner filed motions for temporary order of allocation of parental responsibilities and for temporary relief. In the latter motion, petitioner stated that he is unable to pay for the expenses related to the marital residence without contribution from respondent. He

requested entry of an order requiring respondent to seek and maintain full-time employment or engage in job-training.

¶ 7     On November 24, 2021, the trial court entered an agreed order addressing parenting issues. The order provided that the parties shall have shared parenting responsibilities for the children on a temporary basis with respondent having the majority of parenting time. The order also outlined general rules of conduct for the parties, including issues involving transportation, communication, and the children's activities. On February 18, 2022, after an evidentiary hearing, the trial court entered a new temporary order with respect to the allocation of parental responsibilities. Pursuant to that order, respondent retained the majority of parenting time, but petitioner's parenting time was increased. As with the November 24, 2021, order, the February 18, 2022, order addressed issues related to transportation, communication, and the children's activities.

¶ 8     On February 22, 2022, the trial court entered an order allowing petitioner to access and use marital funds held in his individual retirement account (IRA) for purposes of paying "marital expenses." The court reserved the issue of allocation of any such withdrawals. The February 22, 2022, order also required the parties to complete written discovery by March 18, 2022, and oral discovery by April 22, 2022, and set the matter for trial commencing on June 6, 2022.

¶ 9     On April 26, 2022, the trial court entered an order pursuant to section 604.10(b) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/604.10(b) (West 2020)) after learning that S.S. viewed suicide-related videos on YouTube and expressed difficulty dealing with his parents' divorce. Pursuant to that order, the trial court appointed Joseph Canevello to assess S.S.'s mental health, including whether to secure further treatment for the minor.[1]

---

[1]Canevello prepared a letter and recommendations dated May 10, 2022. However, neither

¶ 10    On May 4, 2022, the GAL filed her first report. In preparation for the report, the GAL interviewed both children and the parties on multiple occasions. In addition, she reviewed: (1) all emails, documents, text messages, and recordings received from the parties; (2) pleadings and other court documents filed in the dissolution proceeding; (3) communications from the parties' attorneys; (4) communications between the parties via Our Family Wizard (OFW); and (5) the parties' testimony during the hearings on temporary matters. The report summarized the GAL's investigation and her opinion as it relates to the statutory factors set forth in sections 602.5(c) (decision making) and 602.7 (parenting time) of the Act (750 ILCS 5/602.5(c), 602.7 (West 2022)). The GAL recommended that the parties have (1) joint decision-making authority relative to healthcare, education, and religious training and (2) reasonable and liberal parenting time with the children. The GAL did not recommend a specific schedule in her report.

¶ 11    On May 13, 2022, respondent moved to reopen discovery and for entry of an order to obtain an evaluation of petitioner's business, BSoft Solutions, Inc. (BSoft), and real estate appraisals. On June 1, 2022, the trial court entered an order granting respondent's motion in part and reopened discovery for the limited purpose of the valuation of BSoft and two properties owned by the parties. The court reset deadlines for discovery, and the trial was rescheduled for August 18, 2022. On June 3, 2022, respondent filed a petition for interim attorney fees and costs. On June 23, 2022, the trial court entered an order granting respondent permission to access and use marital funds held in her IRA "for purposes of paying for her attorney's fees, [GAL] fees, business valuation, and real estate appraisals." The court reserved the issue of allocation of any such withdrawals.

---

party admitted the letter into evidence.

¶ 12    On July 22, 2022, the GAL filed a supplemental report after conducting additional interviews with the children and the parties and reviewing additional documents. The GAL stated that she could no longer recommend joint decision making or equal parenting time. Instead, the GAL recommended that respondent be allocated sole decision-making authority and a majority of parenting time during the school year. The GAL explained that while she was initially hopeful that the parties would be able to jointly parent the children and share parenting time in a healthy manner, that no longer seemed possible. The GAL cited, *inter alia*, disagreements among the parties regarding whether counseling was beneficial to S.S., petitioner's failure to admonish S.S. to follow the rules established by respondent, and conduct by both parties which placed the children in a position of having to choose between the parents.

¶ 13                                B. The Trial

¶ 14    Trial commenced on August 18, 2022, and continued over several dates through February 14, 2023. During the trial, both parties testified and introduced copious documents into evidence, including individual and corporate income tax returns, supporting documents for the tax returns, and hundreds of pages of OFW messages. The GAL also provided extensive testimony. In addition, the trial court conducted an *in camera* interview of the children. The following evidence relevant to the issues raised on appeal was adduced at the trial.[2]

¶ 15    When trial commenced, petitioner was 48 years of age and respondent was 43 years of age. Petitioner was self-employed at BSoft, a business founded late in 2004 or early in 2005.

_____

[2]Given the volume of testimony and evidence presented at trial, it is difficult to concisely summarize. To the extent necessary, we provide a more detailed discussion of the facts necessary to a resolution of the individual issues raised on appeal as those issues are addressed.

Respondent worked part time as a teller at Home State Bank. The parties owned two parcels of real estate—the marital home located in Algonquin and a property located in Barrington. The Algonquin property was acquired in March 2009. The Barrington property was acquired in 2014. At the time of the trial, respondent was living in the Algonquin property. The parties rented out the Barrington property until mid-2022, at which time petitioner began residing there. Neither party planned to live in the Barrington property following the dissolution of the marriage. The parties' assets also included bank accounts, college savings accounts, and retirement accounts.

¶ 16                              1. Petitioner's Testimony

¶ 17    Petitioner testified that BSoft is a technology company that offers software and consulting services. BSoft also "pre-funds" gift cards to clients. Petitioner explained that the gift cards are digital and obtained through an outside company. The client deposits funds with BSoft. Petitioner retains the funds in BSoft's checking account until such time as they are expended on gift cards or the client asks for the return of the funds. Petitioner testified that although these funds are paid upfront and held in BSoft's checking account, they do not constitute money "earned" by BSoft.

¶ 18    Petitioner testified that at one time, BSoft had between 10 and 12 employees, including respondent. However, at the time of trial, petitioner was BSoft's only employee. Petitioner testified that BSoft has four or five clients. Servicing those clients provides petitioner with full-time work. Petitioner testified that since July 2021, his monthly salary from BSoft has consistently been $6666.66. BSoft also pays for some of petitioner's expenses, including his car lease, car insurance, and telephone expenses. In addition, petitioner takes a draw or bonus from BSoft if he "can." Petitioner testified about draws in differing amounts he took from BSoft over the years.

¶ 19    Petitioner testified that his cousin, D.J. Alwattar, invested in BSoft. To this end, BSoft as the borrower and Alwattar as the lender executed a promissory note for the principal amount of

$33,500 on August 18, 2017. The promissory note was admitted into evidence and provides for an interest rate of 15% per year on the unpaid balance, beginning on January 30, 2017. The note was to be repaid in full, plus accrued interest, by January 31, 2022, or upon demand from the lender. Petitioner initially testified that no payments had been made on the promissory note. Petitioner explained that he contacted Alwattar for an extension to pay and Alwattar agreed to have the note repaid at "[s]ome point in the future." At a subsequent trial date, petitioner testified that Alwattar asked about the loan and petitioner gave him $45,000 in December 2022 for "part of it."

¶ 20    Petitioner testified that BSoft also took out a loan from the Small Business Administration (SBA) as part of a COVID-related program. The loan authorization and agreement between BSoft and the SBA was admitted into evidence. That document authorizes BSoft to borrow $150,000, and states that payment of principal and interest of $731 monthly would begin 12 months from the date of the note, August 29, 2020. At the time of trial, petitioner had not begun to pay back the SBA loan. Petitioner testified that in mid-September 2022, he received a letter from the SBA stating that his loan payments would have to start. When asked about the terms of repayment in the SBA letter and when the first payment was due, petitioner stated that he did not read the letter "fully." The SBA letter was not admitted into evidence.

¶ 21    Petitioner identified LPL Financial Account 6706 as an IRA account he opened prior to the marriage, when he worked for Northland Laboratories. Petitioner left the employ of Northland Laboratories late in 2005 after the beginning of the marriage. Petitioner initially stated that he did not make any contributions to the account during the marriage. He later acknowledged that he contributed to the account for between six and nine months after the marriage. The value of LPL Financial Account 6706 was $15,402.59 as of July 31, 2022.

¶ 22    Petitioner identified LPL Financial Account 5278 as his SIMPLE IRA opened during the marriage. The value of LPL Financial Account 5278 as of January 1, 2022, was $119,994.05. Petitioner obtained an order of the court allowing him to use funds from LPL Financial Account 5278 during the dissolution proceedings. To this end, petitioner took multiple withdrawals from the account to pay credit card bills, mortgages, attorney fees, GAL fees, utilities, and other costs. As of July 31, 2022, the value of LPL Financial Account 5278 was $46,580.14.

¶ 23    Petitioner identified LPL Financial Account 5627 as an investment account opened during the marriage. As of the date of petitioner's testimony, the value of LPL Financial Account 5627 was $494.74.

¶ 24    Petitioner identified LPL Financial Account 8091 as respondent's SIMPLE IRA opened during the marriage. The value of LPL Financial Account 8091 as of January 1, 2022, was $130,515.53. According to petitioner, respondent withdrew $15,000 from LPL Financial Account 8091 through July 31, 2022. As of July 31, 2022, the value of LPL Financial Account 8091 was $94,543.68. Petitioner testified that respondent opened a 401(k) account during the marriage through her employment at Home State Bank, but the account was of negligible value.

¶ 25                                    2. Respondent's Testimony

¶ 26    Respondent testified that she received a bachelor's degree in civil engineering from Baghdad University in Iraq in 2000. In 2005, respondent obtained a bachelor's degree in commerce with a minor in economics from Carleton University in Canada. Respondent also has a diploma in statistics from the Canadian Research Society. Respondent testified that after she graduated from Carleton University, she began working for BSoft. Respondent's duties for BSoft included accounting, finance, payroll, marketing, and human resources. Respondent testified that she stopped working for BSoft in 2015 because petitioner became "abusive" and difficult to work with

(a point petitioner disputed). After leaving BSoft, respondent applied for over 170 jobs in her educational field and had 15 interviews, but received no job offers. Petitioner returned to BSoft from 2018 through 2020 in an unpaid, part-time position, doing accounting and payroll.

¶ 27    From March 2021 through June 2021, respondent worked as a lunch supervisor at Y.S.'s school. From March 2021 through July 2021, respondent also worked part time as a teacher's assistant at a preschool. In July 2021, respondent began working full time as a teller at Home State Bank. When respondent was hired at Home State Bank, she earned $12 per hour and worked between 38 and 40 hours per week. In October 2021, respondent voluntarily reduced her hours at Home State Bank to spend more time with the children. At the time of trial, respondent was earning $16 per hour at Home State Bank and worked 25 hours per week.

¶ 28    Respondent testified that she did not obtain a written valuation for BSoft. She retained a business valuator, but she was unable to obtain the documentation requested by the valuator because of a delay in discovery by petitioner. Respondent noted that petitioner sent her a text message in 2017, in which he stated that the value of BSoft was $2 to $3 million. In addition, petitioner verbally told respondent in 2018 or 2019 that the value of BSoft was at least $8 million.

¶ 29    Respondent testified that when she returned to BSoft in 2018, one of her first tasks was to work on the financial bookkeeping for 2015, 2016, and 2017, because no one touched the books after she left the business. At that time, petitioner did not provide her with any documentation about loans made to BSoft between 2015 and 2017. However, petitioner verbally told respondent about a transaction with Alwattar after she noticed two entries in Quickbooks, one for $20,000 and one for $13,500. Petitioner stated that the $20,000 entry was a capital investment and the $13,500 entry was a loan. Petitioner further indicated that there were no loan terms and that Alwattar told

petitioner to repay the loan when he sells the business. Respondent documented the transactions for purposes of BSoft's 2017 tax return as a $20,000 capital investment and a $13,500 loan.

¶ 30                                                    3. The Children

¶ 31    When the trial began, S.S. was 14 years old and Y.S. was 10 years old. In her report, the GAL described S.S. as "intelligent and engaging" and Y.S. as "engaging and friendly." When the GAL first met the children, S.S. was participating in coding and martial arts. Y.S. was participating in swimming, ice skating, and horseback riding. Both children were seeing counselors during the pendency of the dissolution proceedings. The GAL testified that the children love both parents.

¶ 32    The GAL testified that when she first interviewed S.S., he was very talkative. However, as her interactions with S.S. increased, he became less talkative and more guarded. The GAL opined that petitioner "holds more influence over [S.S.] on certain things" than respondent and she attributed the change in the minor's openness to S.S. trying to protect petitioner.

¶ 33    The GAL further testified that S.S. initially told her that he wanted to spend more time with petitioner because petitioner treats him better than respondent. S.S. did not specify how the time would be divided. At another point, S.S. told the GAL that he wanted to spend an equal amount of time with each parent. The GAL testified that Y.S. initially told her that she wanted to see both parents equally and live with them both. However, Y.S. later indicated that she wanted to spend the majority of time with petitioner. The GAL opined that the children are not mature enough to make a decision about the allocation of parenting time.

¶ 34    The GAL also testified about S.S. viewing suicide-related videos. The GAL noted that petitioner never directly told respondent about S.S.'s behavior and he waited three weeks after finding out about it before contacting the GAL. The GAL also stated that there was no indication that petitioner informed S.S.'s counselor about the minor's behavior. When asked why he had not

said anything earlier, petitioner told the GAL "the less communication the better." When the GAL asked S.S. why he was watching suicide-related videos, S.S. said that he was depressed because he felt "pressure" from petitioner, petitioner threatened to leave him, and petitioner was mad about school. The GAL asked follow-up questions to elicit more information, but S.S. told her that he could not remember. S.S. then denied that petitioner said anything. Petitioner also told the GAL about an incident in which S.S. punched or kicked a hole in the wall at petitioner's house. S.S. told the GAL that he made the hole in the wall because he was "frustrated."

¶ 35    During his *in camera* interview, S.S. told the trial court that he is "thinking of spending a lot of time with [petitioner] and some time with [respondent]." S.S. explained that he prefers to spend more time with petitioner than respondent because petitioner is "more *** free in the house" and S.S. is "able to work with [petitioner] and communicate with him more." S.S. also said that at petitioner's house the children are "more active and *** getting prepared for the future and planning a lot of things" whereas at respondent's house they are "not as active." S.S. also asked the court to allocate decision making to petitioner because he "usually wants to sign [S.S.] up for *** important stuff and get [him] *** prepared for [his] future." In contrast, S.S. stated that respondent "doesn't want [him] to get prepared that early."

¶ 36    During her *in camera* interview with the trial court, Y.S. stated that she would like to spend "two weeks with [petitioner] and then a week with [respondent]." She remarked that such a schedule would "probably smooth it out." She explained that when she is at petitioner's house, she has a "short amount of time" because of her extracurricular activities. Y.S. further stated that it would be better for petitioner to make the big decisions in her life because he "really takes care more of activities." She noted that petitioner enrolled her in several extracurricular activities.

¶ 37                    C. Trial Court's Memorandum Decision and Judgment

¶ 38    On April 3, 2023, the trial court issued a thorough, detailed, and well-reasoned memorandum decision and judgment dissolving the parties' marriage. Initially, the court noted that it considered all the evidence presented at the hearing. With respect to the credibility of the parties, the court found the GAL and respondent to be "generally credible." It found petitioner's credibility "suffered with [the] Court" based upon his demeanor while testifying, including repeated attempts to interrupt and providing information beyond that called for by the question. In support of its credibility finding, the court also cited instances in which petitioner lied, petitioner's communications with respondent, which included threats and self-serving accusations, and his willingness to involve the children in disputes and the litigation.

¶ 39    The court next addressed the allocation of parental responsibilities with respect to decision-making and parenting time. The court found that both parties have, at times, acted contrary to the children's best interests. However, after extensively analyzing each statutory factor set forth in sections 602.5(c) and 602.7(b) of the Act (750 ILCS 5/602.5(c), 602.7(b) (West 2022)), the court determined that it is in the children's best interests that respondent be assigned sole significant decision-making responsibilities and the majority of parenting time.

¶ 40    In support of this conclusion, the trial court cited five principal reasons. First, the court found that respondent presented credible testimony that petitioner had physically abused her in the presence of the children. The court cited an incident in which petitioner choked respondent and another in which he forcibly pushed her against a wall and against her chest. The court also found that petitioner's communications with respondent had been abusive, replete with name-calling and threats to take the children. Second, the court determined that petitioner's history of violent behavior was coupled with ongoing controlling and manipulative conduct. The court cited incidents in which petitioner actively encouraged the children to disregard respondent's rules,

repeatedly asserted in OFW messages that respondent was a bad parent, smashed respondent's phone, and took away respondent's car keys. The court did not believe that petitioner would foster a relationship between respondent and the children if he had the majority of the parenting time or decision-making authority. Third, the court was concerned about petitioner's reaction to S.S. searching for information about suicide. The court noted that petitioner did not relay information about S.S.'s conduct to respondent, the GAL, or S.S.'s counselor for weeks and he did not take S.S. for an additional evaluation. The court concluded that petitioner's lack of reaction was not in S.S.'s best interests. Fourth, the court found that while both parties had unnecessarily involved the children in their disputes, petitioner actively undermined respondent's relationship with the children. The court cited an incident in which petitioner removed his belongings from the Algonquin property in the presence of the police and the children as well as evidence that petitioner repeatedly informed the children about the parties' disputes. Fifth, the court determined that the GAL's opinion weighed in favor of assigning respondent sole significant decision-making responsibilities and the majority of parenting time. The court acknowledged that the children expressed a preference to spend more time with petitioner and that petitioner had been increasingly involved in caretaking and decision-making before and during litigation. Nevertheless, the court concluded that the children's preferences did not outweigh its other concerns.

¶ 41    The court awarded petitioner parenting time every Tuesday after school (or beginning at 4 p.m. on days with no school) until 8 p.m. The court also awarded petitioner parenting time on Thursdays after school (or beginning at 4 p.m. if there is no school) until school on Friday morning. Every other week, petitioner's Thursday parenting time extends until school on Monday morning. If there is no school on that Monday, petitioner's parenting time extends until 6:30 p.m. The court awarded respondent all parenting time not otherwise assigned to petitioner. The court divided

holidays and school breaks evenly between the parties according to a schedule incorporated into the judgment. Additionally, the court provided the parties with two consecutive weeks of parenting time during summer for vacation.

¶ 42    The court then turned to the classification and division of marital property. Among other things, the court classified the Algonquin property as a marital asset and valued it at $340,000. The court assigned the Algonquin property to respondent, noting that she was assigned a majority of the parenting time and it would allow S.S. and Y.S. to maintain a stable place of residence and remain in their current school district. Similarly, the court classified the Barrington property as a marital asset and valued it at $285,000. Noting that neither party intended to reside in the Barrington property, the court ordered the property sold with the net proceeds divided equally between the parties.

¶ 43    Next, the court addressed the parties' investment and retirement accounts. The court found all the investment and retirement accounts were marital. In this regard, the court determined that petitioner failed to sustain his burden of proof that LPL Financial Account 6706 was his nonmarital property. The court noted that although petitioner initially claimed that he made no transfers or contributions to the account during the marriage, he later contradicted himself and indicated that some contributions were made for a period of months at the beginning of the marriage. The court assigned LPL Financial Accounts 5627 ($494.74) and 6706 ($15,402.59) to petitioner. The court assigned LPL Financial Account 5278 ($46,580.14) and the Home State Bank 401(k) ($663.02) to respondent. The court valued LPL Account 8091 at $94,543.68 and assigned half of it to petitioner and half of it to respondent. This resulted in petitioner receiving $63,169.17 of the parties' investment and retirement accounts and respondent receiving $94,515.

¶ 44    The court classified BSoft as marital property because the business began after the marriage. The court valued BSoft at $191,438.85—the proven assets in its checking ($94,494.17) and savings ($100,011.44) accounts minus its credit card debt ($67.26). The court assigned BSoft to petitioner. The court acknowledged that petitioner's testimony about a promissory note between BSoft and Alwattar and a loan between BSoft and the SBA. However, the court concluded that the evidence about the alleged loans was "not sufficient" for it to consider in valuing BSoft.

¶ 45    The court calculated petitioner's gross monthly income at $8130.12. This figure included the sum of petitioner's gross monthly wages of $6666.66, petitioner's average monthly non-employee compensation, and certain personal expenses paid by BSoft each month that qualify as gross income under section 505(a)(3.1)(B) of the Act (750 ILCS 5/505(a)(3.1)(B) (West 2022)). The court found that respondent should be imputed income consistent with full-time work at her current job. Noting that respondent earns $16 per hour at Home State Bank, the court imputed $2773 per month as respondent's gross income (($16 x 40 hours per week x 52 weeks per year)/12 months per year).

¶ 46    Based on the parties' incomes, the length of the marriage, and using the formula set forth in section 504(b-1) of the Act (750 ILCS 5/504(b-1) (West 2022)), the court ordered petitioner to pay respondent $1011.58 per month as spousal maintenance for a period of 12 years and 3 months. The court also ordered petitioner to pay respondent child support of $1281 per month, which support could terminate or be modified pursuant to section 505(g) of the Act (750 ILCS 5/505(g) (West 2022)).

¶ 47    On April 25, 2023, petitioner filed a motion to reconsider the judgment. Among the issues petitioner asked the court to reconsider were its rulings on the allocation of decision-making and parenting time, its valuation of BSoft, its division of the parties' retirement accounts, and its

calculation of his income. On May 16, 2023, the trial court entered an order denying in part petitioner's motion to reconsider. Specifically, "for the reasons stated on the record," the court declined petitioner's motion to reconsider various issues, including the valuation of BSoft, the division of the retirement accounts, and the calculation of his income.[3] On May 25, 2023, the trial court entered an order denying the remainder of petitioner's motion to reconsider "for the reasons stated on the record." On June 21, 2023, petitioner filed a notice of appeal.

¶ 48                                          II. ANALYSIS

¶ 49      On appeal, petitioner raises four issues. First, he argues that the trial court improperly valued BSoft. Second, he argues that the trial court erred in determining his income for purposes of his support obligations. Third, he argues that the trial court improperly divided the parties' retirement accounts. Finally, he argues that the trial court erred in its allocation of parental responsibilities.

¶ 50      Prior to addressing these claims, we note that petitioner, as the appellant, has the burden of presenting a sufficiently complete record of the proceedings to support his appellate arguments. See *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984); *In re Marriage of Keegan*, 2022 IL App (2d) 190495, ¶ 41. As our supreme court has stated, "[a]n issue relating to a circuit court's factual findings and basis for its legal conclusions obviously cannot be reviewed absent a report or record of the proceeding." (Internal quotation marks omitted.) *In re Marriage of Gulla*, 234 Ill. 2d 414, 422 (2009); see also *Corral v. Mervis Industries, Inc.*, 217 Ill. 2d 144, 156 (2005). In the absence of a complete record, a reviewing court will presume that the trial court's ruling conformed with

---

[3] The court granted a portion of the motion to reconsider with respect to an issue related to the award of personal property.

the law and had a sufficient factual basis. *Foutch*, 99 Ill. 2d at 391; *Keegan*, 2022 IL App (2d) 190495, ¶ 66. We will resolve against an appellant any doubts that arise from an incomplete record. *Foutch*, 99 Ill. 2d at 392; *Keegan*, 2022 IL App (2d) 190495, ¶ 66.

¶ 51    Here, our review of the four issues petitioner raises on appeal is hindered by his failure to include a sufficiently complete record of the proceedings. The record contains the transcripts from the dissolution trial. However, after the trial court issued its ruling in this case, petitioner moved the trial court to reconsider. As noted above, in his motion to reconsider, petitioner challenged the trial court's ruling on numerous grounds, including the four issues he raises in this appeal. The trial court denied the motion to reconsider "for the reasons stated on the record." In light of these orders, it is reasonable to presume that the trial court considered argument and weighed evidence pertaining to the issues raised in the motion to reconsider and announced on the record its findings with respect thereto. However, petitioner did not include in the record on appeal the transcript from the proceedings on his motion to reconsider or an acceptable substitute. See Ill. S. Ct. R. 323 (eff. July 1, 2017) (allowing for a bystander's report or an agreed statement of facts in lieu of a transcript). Accordingly, in reviewing petitioner's claims, we will resolve all insufficiencies in the record against him. With this principle in mind, we turn to petitioner's assignments of error.

¶ 52                                    A. Valuation of BSoft

¶ 53    Petitioner first contends that the trial court improperly valued BSoft. Once the trial court classifies property as either marital or non-marital, it must divide the parties' marital property in "just proportions." 750 ILCS 5/503(d) (West 2022). Thus, in apportioning marital assets under section 503(d), the court must first establish the value of the property. *In re Marriage of Cutler*, 334 Ill. App. 3d 731, 736 (2002); *In re Marriage of Grunsten*, 304 Ill. App. 3d 12, 16-17 (1999). To properly do so, the court must have before it competent evidence of value. *In re Marriage of*

*Stone*, 155 Ill. App. 3d 62, 70 (1987). It is the obligation of the parties in a dissolution proceeding to present sufficient evidence as to the value of the marital assets. *In re Marriage of Liszka*, 2016 IL App (3d) 150238, ¶ 40. A party should not be allowed to benefit on review from his or her failure to introduce evidence at trial. *In re Marriage of Abu-Hashim*, 2014 IL App (1st) 122997, ¶ 29. Where a party does not offer evidence of an asset's value, the party cannot complain as to the valuation of the asset by the court. *Abu-Hashim*, 2014 IL App (1st) 122997, ¶ 29.

¶ 54    Valuation of marital property is a question of fact. *In re Marriage of Brill*, 2017 IL App (2d) 160604, ¶ 56; *Stone*, 155 Ill. App. 3d at 70. It is within the province of the trier of fact to assess the credibility of the witnesses, assign weight to the evidence, and resolve conflicts in the evidence (see *In re Marriage of McHenry*, 292 Ill. App. 3d 634, 641 (1997); *In re Marriage of Gunn*, 233 Ill. App. 3d 165, 183 (1992); *In re Marriage of Weinberg*, 125 Ill. App. 3d 904, 909-10 (1984)), and a valuation within the range of competent evidence presented at trial will not be disturbed on appeal (*In re Marriage of Schlichting*, 2014 IL App (2d) 140158, ¶ 74; *In re Marriage of Weinberg*, 125 Ill. App. 3d 904, 910 (1984)). We review the trial court's findings of fact using the manifest-weight-of-the-evidence standard. *In re Marriage of Hyman*, 2023 IL App (2d) 220041, ¶ 11. A decision is against the manifest weight of the evidence only where the opposite conclusion is clearly apparent or where the court's findings are unreasonable, arbitrary, or not based on the evidence. *In re Marriage of Romano*, 2012 IL App (2d) 091339, ¶ 44. A reviewing court can affirm the trial court's ruling for any reason apparent in the record. *In re Marriage of Wengielnik*, 2020 IL App (3d) 180533, ¶ 12.

¶ 55    Here, the trial court concluded that BSoft was a marital asset and assigned it to petitioner. Regarding the value of BSoft, the court observed that business valuations are often complex, addressing factors such as fixed assets, accounts receivable, and goodwill. The court noted,

however, that neither party provided such information to the court "in a credible form" or presented any expert testimony regarding the value of the business. Accordingly, to value BSoft, the trial court considered the cash in the business's checking and savings accounts and its corporate credit card debt. The trial court added the funds in the checking account ($94,494.17) and the savings account ($100,011.44) and then subtracted from that sum the corporate credit card debt ($67.26). This resulted in a value for BSoft of $191,438.35 (($94,494.17+$100,011.44)-$67.26). The court concluded that other than the cash and debts described above, there was no credible evidence that BSoft had additional assets or debts that could be included in its value. The court specifically declined to reduce the value of BSoft by the amounts of the alleged loans from Alwattar and the SBA. The court determined that the evidence presented in relation to these purported debts was "not sufficient" for it to consider in valuing the business.

¶ 56    The trial court's valuation of BSoft was not against the manifest weight of the evidence. The decision in *Abu-Hashim*, 2014 IL App (1st) 122997, is instructive. There, the parties co-owned a daycare business. At trial, the parties presented little evidence as to the value of the business, so the trial court multiplied the amount of the wife's annual salary ($85,000) by three, the minimum number of years the court determined the business could remain viable based on the economy and the financial history of the business. From that product, the trial court subtracted $20,000 in past-due rent and damages from flooding. This yielded a value of $235,000 (($85,000x3)-$20,000). On appeal, the husband argued that the method used by the trial court to value the daycare center was not an accepted method of valuation. *Abu-Hashim*, 2014 IL App (1st) 122997, ¶ 28. The reviewing court disagreed, reasoning that because neither party presented meaningful evidence of the value of the daycare business, it could not say that the method used to value the business was improper. *Abu-Hashim*, 2014 IL App (1st) 122997, ¶ 31. We reach the same conclusion here.

¶ 57    Like the parties in *Abu-Hashim*, neither petitioner nor respondent presented any expert testimony regarding the value of BSoft or any evidence regarding fixed assets, accounts receivable, or goodwill. Moreover, the trial court found the evidence regarding the purported loans from Alwattar and the SBA was "not sufficient" to consider in valuing the business. Thus, the only competent evidence the court had to value BSoft was the assets in its checking and savings accounts and the debt on its corporate credit card. Petitioner does not claim that the amounts the trial court assigned to the bank accounts or credit card debt were incorrect. Because neither party presented meaningful evidence of BSoft's value, the trial court considered the only evidence of value available to it. Given the record before us, we cannot say that a conclusion opposite that of the trial court is clearly apparent or that the trial court's valuation was unreasonable, arbitrary, or not based on the evidence.

¶ 58    Petitioner concedes that the trial court's method of valuation—cash on hand less debts—is not, by itself, "inherently problematic." Nevertheless, he insists that the trial court erred in excluding from the valuation of BSoft debts and obligations totaling $203,650, consisting of the $33,500 Alwattar promissory note, the $150,000 SBA loan, and $20,150 in gift card funds that BSoft holds on behalf of its clients.

¶ 59    In support of his position, petitioner contends that his testimony regarding the validity of these debts and obligations was unrebutted, so the trial court could not reject it. While our supreme court has stated that the trier of fact "cannot arbitrarily or capriciously reject the testimony of an unimpeached witness" (*People ex rel. Brown v. Baker*, 88 Ill. 2d 81, 85 (1981)) this does not mean that the trier of fact is required to accept an uncontradicted witness's testimony under all circumstances (see *People v. Ferguson*, 204 Ill. App. 3d 146, 151 (1990) ("The trier of fact is not required to accept defendant's version of the facts, but may consider its probability or

improbability in light of the surrounding circumstances.")). When sitting as the trier of fact, a trial court is entitled to accept as much or as little of a witness's testimony as it deems appropriate. See, *e.g.*, *Kraft Foods, Inc. v. Illinois Property Tax Appeal Board*, 2013 IL App (2d) 121031, ¶ 58 (rejecting proposition that a trier of fact must accept certain testimony because it is unrebutted since doing so would remove some of the discretion from the trier of fact as to how much weight should be afforded evidence); *Franciscan Communities, Inc. v. Hamer*, 2012 IL App (2d) 110431, ¶ 47 (noting that the trier of fact is free to disbelieve any witness). In this case, the trial court expressly found that petitioner's credibility "suffered with [the] Court." The trial court cited petitioner's demeanor while testifying, instances in which it concluded petitioner had lied, threats and self-serving accusations petitioner made in communications between the parties, and petitioner's willingness to involve the children in disputes and the litigation. As noted earlier, it is within the province of the trier of fact to assess the credibility of the witnesses, assign weight to the evidence, and resolve conflicts in the evidence (see *McHenry*, 292 Ill. App. 3d at 641; *Gunn*, 233 Ill. App. 3d at 183; *Weinberg*, 125 Ill. App. 3d at 909-10). Thus, even if petitioner's testimony was "unrebutted," the trial court was not required to accept it.

¶ 60     Petitioner also contends that the trial court's decision not to consider these debts and obligations constituted error for two other reasons. First, petitioner argues that these debts and obligations were "necessary considerations in the valuation of BSoft using the Trial Court's stated methodology." Second, petitioner maintains that the trial court's decision was improper because the trial court failed to make any assignment of those debts and obligations. We disagree. There was no need to consider or assign these debts or obligations because the evidence presented at trial was not sufficient to establish that they were valid.

¶ 61    With respect to the Alwattar promissory note, petitioner argues that he testified that "the time for repayment was extended, but that the principal still remained due and owing." However, the evidence regarding the existence of the promissory note and its amount was conflicting. The promissory note shows that the document was signed by petitioner and Alwattar on August 18, 2017, in the principal amount of $33,500. Likewise, petitioner testified that in 2017, Alwattar loaned him $33,500. However, respondent testified that in April 2018, when she returned to work for BSoft, she discovered that no one had worked on BSoft's books since 2015. At that time, respondent noticed two unidentified entries, one for $20,000 and one for $13,500. Respondent asked petitioner about the transactions. Petitioner verbally told respondent that the $20,000 transaction was a capital investment from Alwattar and the remaining $13,500 was a loan. Petitioner did not produce the promissory note at that time, and respondent testified that she was not aware of the existence of the document until financial discovery in the dissolution proceeding.

¶ 62    Similarly, evidence regarding the repayment of the promissory note was conflicting. The promissory note required repayment of the principal and accrued interest by January 31, 2022. During proceedings held on September 28, 2022, petitioner testified that the promissory note had not been repaid by that date, but Alwattar had agreed to an extension and the loan would be repaid "at some point in the future." At a subsequent hearing, petitioner testified that Alwattar asked him about the promissory note in November 2022, and that in December 2022, he paid Alwattar $45,000, which amount represented "part" of the total due. Petitioner, however, presented no proof of such payment, the amount remaining due, if any, or the terms of the loan extension.

¶ 63    We also observe that the promissory note states that interest is to be calculated yearly beginning on January 30, 2017. We question why the interest would be calculated beginning in January 2017, if the promissory note was not executed until August 2017. In light of this

conflicting evidence and the trial court's assessment of petitioner's credibility, we cannot say that the trial court's determination that the evidence was insufficient to consider the promissory note in valuing BSoft was against the manifest weight of the evidence.

¶ 64    We next address the SBA loan. The effective date of the SBA loan was August 29, 2020. The stated terms of the loan agreement provide that payments would begin 12 months from the date of the note. At the hearing on September 28, 2022, petitioner indicated that he had not started paying back the SBA loan. Petitioner then testified that he recently received a letter that repayment would have to start. However, petitioner testified that he did not read the letter "fully" and he did not know when the first payment would be due or any other terms of the repayment other than it had to start. Petitioner did not introduce the letter from the SBA into evidence at trial. Considering petitioner had not started repaying the SBA loan at the time of trial, his testimony that he had not read the letter from the SBA, his failure to introduce the SBA letter into evidence, and the trial court's assessment of petitioner's credibility, we cannot say that the trial court's finding that the evidence was insufficient to consider the SBA loan in valuing BSoft was against the manifest weight of the evidence.

¶ 65    Finally, petitioner argues that, in valuing BSoft, the trial court failed to consider the gift card funds held by BSoft on behalf of its clients. The trial court did not expressly address the status of the gift cards in its April 3, 2023, ruling. Petitioner raised this issue in his motion to reconsider. The trial court denied petitioner's motion to reconsider "for the reasons stated on the record." However, as noted above, petitioner did not include a copy of the transcript from the hearing on the motion to reconsider (or an acceptable substitute) in the record on appeal. In the absence of an adequate record, we must presume that the trial court's reason for denying petitioner's motion to reconsider was in conformity with the law and had a sufficient factual basis. *Foutch*, 99 Ill. 2d at

391; *Keegan*, 2022 IL App (2d) 190495, ¶ 66. Accordingly, based on the record before us, we have no basis for disturbing the trial court's ruling and we reject petitioner's claim that the trial court failed to properly consider the gift card funds held by BSoft in valuing the business.

¶ 66    In short, neither party presented meaningful evidence of BSoft's value. Thus, the trial court considered the only competent evidence of value available to it—the assets in BSoft's bank accounts and the debt on its corporate credit cards. Considering the record before us, we cannot say that the trial court's valuation of BSoft was against the manifest weight of the evidence.

¶ 67                                  B. Petitioner's Income

¶ 68    Next, petitioner argues that the trial court erred in calculating his income for maintenance and child support purposes.

¶ 69    As a prerequisite to determining a support obligation, the trial court must determine the parties' annual incomes. See, *e.g.*, 750 ILCS 5/504(b-1)(1)(A), (b-3), (B-3.5) (West 2022); 750 ILCS 5/505(a)(1.5), (a)(3)(A), (a)(3)(B) (West 2022). Credibility or forthrightness of the obligor in disclosing his or her income is a factor for the court to consider when determining a party's income for support purposes. *In re Marriage of Gabriel*, 2020 IL App (1st) 182710, ¶ 42; *In re Marriage of Karonis*, 296 Ill. App. 3d 86, 92 (1998); *In re Parentage of Janssen*, 292 Ill. App. 3d 219, 224 (1997). If a party's income is uncertain or difficult to ascertain, a court may consider past earnings. *Gabriel*, 2020 IL App (1st) 182710, ¶ 40; *Karonis*, 296 Ill. App. 3d at 92; *In re Marriage of Morse*, 240 Ill. App. 3d 296, 309 (1993). Moreover, where the payor spouse's income fluctuates from year to year, the trial court may average the income over several years. See *In re Marriage of Garrett*, 336 Ill. App. 3d 1018, 1025 (2003); *In re Marriage of Freesen*, 275 Ill. App. 3d 97, 103 (1995). The methodology employed by the trial court in calculating a party's income is within the discretion of the trial court and will not be disturbed absent an abuse of that discretion. *Garrett*,

336 Ill. App. 3d at 1025; *Freesen*, 275 Ill. App. 3d at 103. An abuse of discretion occurs only where the trial court's ruling is arbitrary, fanciful, or unreasonable, or where no reasonable person would take the view adopted by the trial court. *In re Marriage of Johnson*, 2016 IL App (5th) 140479, ¶ 93.

¶ 70    Here, the trial court concluded that petitioner's gross regular salary was $6666.66 per month. In addition to his regular salary, the trial court found that petitioner earned "non-employee compensation" from BSoft which varied from year to year. As shown on 1099 tax forms petitioner received, petitioner's "non-employee compensation" was $11,376.16 in 2019, $13,000 in 2020, and $8500 in 2021. Based on these figures, the court calculated petitioner's average annual "non-employee compensation" between 2019 and 2021 as $10,958.72 (($11,376.16+$13,000+ $8500)/3), or $913.23 per month ($10,958.72/12). Finally, the court noted that BSoft pays certain expenses that qualify as gross income under section 505(a)(3.1)(B) of the Act (750 ILCS 5/505(a)(3.1)(B) (West 2022)). The court found that these expenses, which included petitioner's vehicle lease, vehicle insurance, and cell phone bill, averaged $550.23 per month. The court added petitioner's gross regular monthly salary, his average monthly "non-employee compensation," and the average monthly expenses paid on petitioner's behalf by BSoft to arrive at a gross monthly wage of $8130.12 ($6666.66+913.23+$550.23).

¶ 71    According to petitioner, in calculating his income for purposes of determining his support obligations, the trial court improperly used a "hybrid approach" by taking his current gross regular monthly salary and adding to it the average non-employee compensation he received over the three-year period from 2019 through 2021.[4] Petitioner contends that the formula used by the trial

---

[4] Petitioner does not challenge the trial court's inclusion in the calculation of the monthly

court artificially inflated his income because he did not have gross monthly wages of $6666.66 in 2019, 2020, or half of 2021. Petitioner submits that a proper application of the income-averaging approach required the trial court to average his "total documented income" over the three-year period from 2019 through 2021.

¶ 72    At the outset, we conclude that petitioner has forfeited this argument. Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020) requires an appellant's brief to contain "the contentions of the appellant and the reasons therefor, *with citation of the authorities* and the pages of the record relied on." (Emphasis added.) "A contention that is supported by some argument but no authority does not meet the requirements of Rule 341 and is considered forfeited." *Crull v. Sriratana*, 388 Ill. App. 3d 1036, 1045 (2009). Petitioner does not cite any authority in support of his argument that the trial court's use of a "hybrid approach" to calculate his income was improper. The only case petitioner cites in this section of his brief is *Garrett*, 336 Ill. App. 3d at 1025. *Garrett* provides that a court may use an income-averaging approach to calculate a party's income in any case where it is appropriate. *Garrett*, 336 Ill. App. 3d at 1025. We read nothing in *Garrett* for the proposition that, where a party has multiple sources of income, it is improper for the trial court to vary the method it uses to calculate each individual source of income.

¶ 73    Forfeiture notwithstanding, petitioner's argument is unpersuasive. It was appropriate for the trial court to treat petitioner's regular monthly salary differently than his "non-employee compensation." The court could have reasonably concluded that the former was easily ascertainable while the latter was uncertain or difficult to ascertain. In this regard, there was ample evidence regarding petitioner's current monthly salary. Petitioner testified that since July 2021, his

_____

expenses paid on his behalf by BSoft.

regular monthly salary from BSoft has consistently been $6666.66. The paystubs admitted into evidence support this testimony. Similarly, financial affidavits petitioner completed in August 2021, October 2021, February 2022, June 2022, and August 2022, reflect that his regular monthly salary is $6666.66. Since the evidence of petitioner's current regular salary was supported by abundant evidence, the court could reasonably conclude that there was no need to employ an income-averaging approach or otherwise consider past earnings.

¶ 74    In contrast, the record shows that petitioner's "non-employee compensation" fluctuated from year to year. Petitioner testified about draws in differing amounts he took from BSoft over the years. Moreover, the 1099 tax forms submitted into evidence reflect that the "non-employee compensation" claimant received over the three-year period from 2019 to 2021 varied from a low of $8500 to a high of $13,000. Given this evidence, the trial court could reasonably conclude that petitioner's "non-employee compensation" was uncertain or difficult to ascertain because it was subject to variances year by year and that it was more accurate to employ an income-averaging approach with respect to petitioner's "non-employee compensation."

¶ 75    In short, the record establishes that petitioner's "non-employee compensation" fluctuated from year to year, while his regular monthly salary has remained consistent since July 2021. As such, it was reasonable for the trial court to average petitioner's monthly "non-employee compensation" over a three-year period and add this figure to his current regular monthly salary. Because we cannot say that no reasonable person would take the view adopted by the trial court or that the trial court's calculation method was arbitrary, fanciful, or unreasonable, it was not an abuse of discretion. We therefore affirm the trial court's calculation of petitioner's income for purposes of determining his support obligations.

¶ 76                    C. Division of Retirement Accounts

¶ 77    Next, petitioner argues that the trial court erred in dividing the parties' retirement accounts. Petitioner asserts that the trial court granted respondent an advance of her share of the marital estate by allowing her to withdraw IRA funds for the payment of her attorney fees and other litigation costs. Yet, the court did not afford him any credit or reallocation for the advance despite expressly reserving the issue of reallocation in the order granting the advance. Petitioner cites to *In re Marriage of Heroy*, 385 Ill. App. 3d 640 (2008), for the proposition that the failure to give credit is *per se* reversible error.

¶ 78    Prior to trial, the court entered separate orders allowing each party to access and use marital funds in his or her IRA to pay for certain expenses. In the orders, the court reserved the issue of allocation of such withdrawals. During the proceedings, both parties withdrew funds from their respective IRAs. In its ruling, the trial court assigned $94,515 of the balances remaining in the IRAs to respondent and $63,169.17 of the balances remaining in the IRAs to petitioner. The court did not expressly address the allocation of the withdrawals from the IRAs in its ruling. It did state, however, that the division considered "the value of each retirement account; the parties' present income and economic circumstances; [Petitioner's] higher earnings; that *** each [party has] future earning capacity and the ability to continue to save for retirement; and the division of other assets and debt." In his motion to reconsider, petitioner argued that despite the orders reserving the issue of allocation, the court's ruling did not address this issue. Petitioner further asserted that the court's approach "shift[ed] the imbalance of the distribution of the marital estate unjustly toward [respondent]."

¶ 79    The trial court denied petitioner's motion to reconsider "for the reasons stated in the record," but petitioner did not include a copy of the transcript of the hearing on his motion to reconsider (or an acceptable substitute) in the record on appeal. As noted earlier, in the absence of

an adequate record, we must presume that the trial court's reason for denying petitioner's motion to reconsider was in conformity with the law and had a sufficient factual basis. *Foutch*, 99 Ill. 2d at 391; *Keegan*, 2022 IL App (2d) 190495, ¶ 66. Accordingly, based on the record before us, we have no basis for disturbing the trial court's ruling and we reject petitioner's claim that the trial court erred in dividing the parties' retirement assets.

¶ 80                      D. Allocation of Parental Responsibilities

¶ 81    Finally, petitioner argues that the trial court erred in its allocation of parental decision making and parenting time.

¶ 82    The trial court must allocate parental decision-making responsibilities and parenting time according to a child's best interests. 750 ILCS 5/602.5(a) (West 2022) (decision-making); 750 ILCS 5/602.7(a) (West 2022) (parenting time); *In re Marriage of Katsap*, 2022 IL App (2d) 210706, ¶ 124; *Sadler v. Pulliam*, 2022 IL App (5th) 220213, ¶ 42. In making these best-interest determinations, the court must consider all relevant factors, including, but not limited to, the statutory factors set forth in section 602.5(c) of the Act (750 ILCS 5/602.5(c) (West 2022) (enumerating 15 best interest factors for purposes of allocating parental decision-making)) and 602.7(b) of the Act (750 ILCS 5/602.7(b) (West 2022) (listing 17 best interest factors for purposes of allocating parenting time)). See *Katsap*, 2022 IL App (2d) 210706, ¶ 124; *In re Marriage of Virgin*, 2021 IL App (3d) 190650, ¶ 44. A trial court's rulings on the allocation of parental decision-making and parenting time are afforded great deference because the trial court is in a superior position to judge the credibility of the witnesses and determine the best interests of the children. *In re Marriage of Bates*, 212 Ill. 2d 489, 516 (2004); *In re Marriage of Radae*, 208 Ill. App. 3d 1027, 1029 (1991). We will not disturb the trial court's rulings on the allocation of decision-making responsibilities or parenting time unless those rulings are against the manifest

weight of the evidence. *Katsap*, 2022 IL App (2d) 210706, ¶ 124 (parental decision-making responsibilities); *Virgin*, 2021 IL App (3d) 190650, ¶ 45 (parenting time). A decision is against the manifest weight of the evidence only if an opposite conclusion is clearly apparent or if the trial court's findings are unreasonable, arbitrary, or not based on the evidence. *Romano*, 2012 IL App (2d) 091339, ¶ 44. The appellant carries the burden to affirmatively show error on review. *In re Marriage of Smith*, 132 Ill. App. 3d 69, 702 (1985). We will affirm if there is any basis in the record to support the trial court's findings. *In re Marriage of Ricketts*, 329 Ill. App. 3d 173, 177 (2002).

¶ 83    Here, the trial court thoroughly addressed each of the statutory factors and found that it was in the best interests of the children to grant to respondent both sole significant decision-making responsibilities and the majority of parenting time. Nevertheless, petitioner argues that the trial court's decision was against the manifest weight of the evidence. According to petitioner, the trial court failed to adequately consider the wishes of the children.

¶ 84    A mature child's preference about which parent he or she wants to live should be given considerable weight when it is based on sound reasoning. *In re Marriage of Adamson*, 2016 IL App (3d) 150105, ¶ 12; see also *In re Marriage of Siegel*, 123 Ill. App. 3d 710, 718 (1984) ("The preferences of a child, especially one who is mature, are to be given serious weight in custody decisions, especially where the child's desire is based upon reasons related to his best interests such as a desire to remain with friends; to continue attending the same school; and to remain in the same environment"). However, a child's preference is not controlling or binding if the court determines that the child's preference is not in his or her best interest. *Adamson*, 2016 IL App (3d) 150105, ¶ 12 (affirming order which contravened preference of 14 year-old); *In re Marriage of Hefer*, 282 Ill. App. 3d 73, 76-77 (1996) (reversing order that gave controlling weight to

preferences of 13 and 9-year-old siblings); *In re Marriage of Apperson*, 215 Ill. App. 3d 378, 384 (1991) (affirming order contrary to stated preference of 13-year-old); *Shoff v. Shoff*, 179 Ill. App. 3d 178, 185 (1989) (affirming order rejecting preference of nine-year-old; child "not mature"); *In re Marriage of Leff*, 148 Ill. App. 3d 792, 810 (1986) (affirming order against preference of 15 year old). Some courts have warned that a court's reliance on a child's preference "provides an incentive for parental manipulation and intimidation of the child, and an opportunity for the child's manipulation of the parents, none of which can be said to be in the best interest of the child." See *Hefer*, 282 Ill. App. 3d at 77.

¶ 85    Here, during their *in camera* interviews with the trial court, both children expressed a preference to spend more time with petitioner and for petitioner to have more of the decision-making responsibilities. The trial court found that both children appeared mature and their reasons for their preferences were consistent with evidence regarding their backgrounds. Nevertheless, the court concluded that the children's preferences to spend more time with petitioner was outweighed by several concerns, including petitioner's physical abuse of respondent in front of the children, petitioner's ongoing controlling and manipulative behavior, petitioner's delayed reaction to S.S. searching for information about suicide, petitioner's attempts to interfere with respondent's relationship with the children, and the GAL's recommendation that respondent have sole significant decision-making responsibilities and a majority of the parenting time. "Deciding what is best for the child poses a question no less ultimate than the purposes and values of life itself." Robert Mnookin, *Child-Custody Adjudication: Judicial Functions in the Face of Indeterminacy*, 39 Law & Contemp. Probs. 226, 260 (Summer 1975). It is well settled that it is not the function of the reviewing court to reweigh the evidence or assess witness credibility and set aside the circuit court's decision simply because a different conclusion may have been drawn from the evidence.

*In re Marriage of Pfeiffer*, 237 Ill. App. 3d 510, 513 (1992). Petitioner's arguments on this issue—all of which are unavailing—are an attempt to have this court reweigh the evidence and reassess witness credibility, which we will not do. The able trial court thoroughly reviewed the applicable statutory factors in assessing the evidence and provided cogent reasons for rejecting the children's wishes and allocating parental responsibilities as it did. None of petitioner's arguments warrant a finding that the trial court's allocation of parental responsibilities was against the manifest weight of the evidence.

¶ 86                                III. CONCLUSION

¶ 87    For the reasons set forth above, we affirm the judgment of the circuit court of McHenry County.

¶ 88    Affirmed.